**No. 13-4577(L)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**UNITED STATES OF AMERICA,**
**Appellee,**

**v.**

**KEVIN GARCIA FUERTES**
**and**
**GERMAN DE JESUS VENTURA**
**Appellants.**

***Appeal from the United States District Court for the District of Maryland, Northern Division***
***Honorable William D. Quarles, Jr., District Judge***

# SUPPLEMENTAL JOINT APPENDIX
# VOLUME I OF I

**Michael D. Montemarano***
**Michael D. Montemarano, PA**
**Suite 146**
**10630 Little Patuxent Parkway**
**Columbia, Maryland 21044**
**(410) 992-0067**
**montemarano67@gmail.com**

***Lead Counsel & Counsel for Appellant Kevin Fuertes***

**Nicholas J. Vitek**
**Vitek Law LLC**
**111 S. Calvert Street, Suite 2700**
**Baltimore, Maryland 21202**
**(410) 317-8500**
**vitek@viteklaw.com**

***Counsel for Appellant German Ventura***

**Rod J. Rosenstein**
**United States Attorney**

**P. Michael Cunningham**
**Rachel M. Yasser**
**Assistant U.S. Attorneys**
**36 S. Charles Street, 4th Floor**
**Baltimore, Maryland 21201**
**(410) 209-4800**

***Attorneys for the Appellee***

# TABLE OF CONTENTS

Excerpt of Trial Transcripts, dated April 16 and 17, 2013 (Kelly Testimony)…... 1

Excerpt of Trial Transcript, dated April 17, 2013 (Fed.R.Crim,P. 29 Motion Proceedings)…...……………………………………………..24

Excerpt of Trial Transcript, dated April 18, 2013 (Jury Instructions Conference)………………………........................................................31

Excerpt of Trial Transcript, dated April 18, 2013 (Ventura Testimony)…………..65

Excerpt of Trial Transcript, dated April 18, 2013 (Renewed Fed.R.Crim,P. 29 Motion)…………….…..…………………………………………..75

Excerpt of Trial Transcript, dated April 19, 2013 (Government's Closing and Rebuttal Arguments)……………………………………...…………..77

Excerpt of Trial Transcript, dated April 19, 2013 (Jury Instructions)……………132

Excerpt of Government's Requested Jury Instructions (Dkt 152)………………..164

Defense Response to [Government's] Proposed Jury Instructions (Dkt 175)……187

Government's Response [to Dkt 175]…………………………………………189

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Docket No. WDQ-10-0770 |
| | Volume VI |
| GERMAN de JESUS VENTURA and KEVIN GARCIA FUERTES, Defendants | |

Baltimore, Maryland
April 16, 2013
9:27 AM to 5:54 PM

**THE ABOVE-ENTITLED MATTER CONTINUED ON FOR JURY TRIAL**
**BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**

A P P E A R A N C E S

On behalf of the Government:

Michael Cunningham, Assistant U.S. Attorney
Rachel Yasser, Assistant U.S. Attorney

On behalf of Defendant German de Jesus Ventura:

Gerald Ruter, Esquire

On behalf of Defendant Kevin Garcia Fuertes:

Michael D. Montemarano, Esquire

A P P E A R A N C E S (CONT.)

Also present:

HSI Special Agent Edward Kelly
Victoria Kirchgessner, Spanish Interpreter
Marta Goldstein, Spanish Interpreter

Reported by:

Martin J. Giordano, RMR, CRR, FOCR
U.S. Courthouse, Room 5515
101 West Lombard Street
Baltimore, Maryland 21201
410-962-4504

**THE CLERK:** Raise your right hand.

**EDWARD J. KELLY**

**WAS THEN DULY SWORN TO TELL THE TRUTH**

**THE CLERK:** Be seated. You can scoot up and speak directly toward the mic. State your name, and then spell it for the record, please.

**THE WITNESS:** Edward J. Kelly, E-D-W-A-R-D, K-E-L-L-Y.

**DIRECT EXAMINATION**

**BY MS. YASSER:**

Q. Special Agent Kelly, where do you work, sir?

A. Homeland Security Investigations, Baltimore, Maryland.

Q. Is that commonly known as HSI?

A. Yes, ma'am.

Q. How long have you been with HSI?

A. Since 2003, when it was created.

Q. And where did you work before 2003?

A. I was an INS special agent.

Q. How long have you been with Immigration?

A. Since 1997, when I came on as a Border Patrol agent.

Q. And where were you a Border Patrol agent?

A. South Texas, ma'am.

Q. And what did you do in South Texas as a Border Patrol agent?

A. Patrolled the border between the points of entry, north

of the ports of entry, the highways south of the checkpoints.

**THE REPORTER:** I'm sorry. At points of entry?

**THE WITNESS:** Points of entry, yes. And we patrolled the interior between the ports of entry and the checkpoint north of us, the Harlingen Station.

**THE REPORTER:** I'm sorry. The what station?

**THE WITNESS:** Harlingen, H-A-R-L-I-N-G-E-N.

**BY MS. YASSER:**

Q. How long were you a Border Patrol agent in South Texas?

A. Approximately three and a half years.

Q. And then you joined -- where did you go after that, I should ask?

A. I transferred to the Philadelphia District Investigations for INS as an Immigration Enforcement Agent, Allenwood, Pennsylvania, an institutional hearing program.

Q. And what did you do as an enforcement agent?

A. We processed federal prisoners that were in the custody of the Bureau of Prisons for Immigration proceedings so, when they finished doing their criminal time, they would be processed more quickly to be removed from the United States at the appropriate -- if appropriate.

Q. When did you become a special agent with HSI?

A. 2002.

Q. Okay. And what unit are you currently a part of?

A. I'm with human trafficking, human smuggling, and worksite

enforcement.
Q. How long have you been doing human trafficking, human smuggling, and worksite enforcement cases?
A. I started investigating human trafficking approximately 2005.
Q. And what are your job responsibilities and duties with respect to those types of cases?
A. We develop informants, we follow leads from non-government organizations, State and local law enforcement, other federal agencies, labor trafficking, sex trafficking.
Q. You mentioned labor and sex trafficking. Are those your areas of expertise?
A. I mainly focus on sex trafficking.
Q. And, with respect to sex trafficking, have you focussed on any certain type of sex-trafficking operations during your time with HSI?
A. We work a lot of Asian massage parlors, and also outcall from Backpage previously, and Hispanic delivery services, and brothels.
Q. You mentioned outcalls from Backpage. What does that mean?
A. On Backpage, there is a section where you can go and browse for prosecution, and outcall means that you call the girl to you. In-call means you go to the girl.
Q. And you investigate cases involving Backpage?

A. We have previously when it's involved foreign nationals.
Q. Now, how many sex-trafficking cases would you say you've worked specifically in the Latino community?
A. Over 50, and that's a low number. As far as -- it's been a lot more than 50.
Q. And do you speak some Spanish, Special Agent Kelly?
A. Yes. I had to to acquire my job with the Border Patrol, and keep it.
Q. Aside from language barriers, are there any other obstacles to investigating cases in the Latino community sex-trafficking operations?
A. Undercover agents are limited that speak Spanish that are allowed into that community that will be serviced by those houses, distrust of law enforcement in general, cultural barriers.
Q. With respect to the victims and witnesses in these cases, what is their typical -- what do you see in terms of typically their Immigration status?
A. The majority of them are undocumented.
Q. I want to talk to you about your involvement in the particular case before the Court. Can you tell the ladies and gentlemen of the jury how and when you got involved with this case.
A. Detective Hartlove contacted me after he went out with the Prince George's County Police Department, because I had

worked a lot of Hispanic brothels with that department, so, when Detective Hartlove met Sergeant Norris of the Prince George's County Police Department, he gave him my contact information because I was familiar with the Latino brothels.

Q. Do you recall approximately when that was?

A. I would say probably about 2008. In the fall, winter of 2008.

Q. And did you assist Detective Hartlove in his investigation?

A. Yes. Anything he asked that we could help with, we would do.

Q. And what did you do over the course of the investigation, if I can get a brief summary of your participation?

A. Some of our agents responded out to Annapolis to assist with interviews on occasion. When he would be at a brothel, he might contact me to ask me what types of questions to ask the girls to try and elicit a response, because many times you have a very brief opportunity with the females, and it's very difficult to have them self identify and bring complaints. So he would ask me how I should form the questions to identify indicators.

If we see indicators in the females, a lot of times we'll try and place them with non-governmental operations to give them a chance to feel safe and be able to better articulate what's happened to them.

Q. Did you also, in the course of your investigation, participate in the policing of consensual calls to known or suspected brothel numbers?

A. Yes.

Q. And did you also follow up and conduct and participate in searches of those brothels?

A. Yes.

Q. What is a consensual call?

A. Maryland's a two-party-consent state. As a federal agent, we can conduct one-party consensual phone calls. We get permission of our supervisors and also the U.S. Attorney's Office. We'll call for -- so we don't do it willy-nilly. It is controlled, and there is reports that are done, but we're able to do one-party consent as a federal agency, and that is to gather evidence of a crime, possibly provide protection for an undercover agent.

Q. I'd like to play a selection of some of the calls that you assisted in recording in this particular case.

**MS. YASSER:** And if I can ask the jury to please pass down the binders at the end of the jury box.

**MR. CUNNINGHAM:** Your Honor, do you want me to approach and assist, or --

**THE COURT:** Yes.

**MS. YASSER:** Your Honor, there is a copy of the binder on your bench as well.

was lubricant, K-Y Jelly for sexual purposes. There were dirty towels. It was unusual in the fact that normally in the -- like Langley Park, where there is a lot of brothels, they'll use the dumpsters so you can't do a traditional trash rip to see what's going on in the house as an investigative technique, but, here, a lot of their trash was in there, so we could see -- we could get a better picture of what was actually happening.

Q. I believe most of that evidence has already been put in, so I'm going to continue with just the pictures, and this is 17b/8. What is that?

A. That's what I take to be a Santa Muerte --

Q. b/18.

A. Pardon.

Q. Sorry. 17b --

A. It appears to be a Santa --

**MS. YASSER:** Excuse me. 17b/18 for the record.

Q. What is that?

A. That's what I take to be a Santa Muerte statue.

Q. And where was that recovered?

A. In that space.

Q. 17b/19?

A. Box of Lifestyle condoms. Some were full. Some were empty.

Q. 17b/21?

A. The trash.
Q. And 17b/22?
A. The rubbing alcohol and more condoms, looks like wipes, and the K-Y Jelly.
Q. Finally, 17b/23?
A. More trash, and it just shows you the filth.
Q. The same day that the [redacted] location was searched back in November of 2010, were other locations and vehicles also searched?
A. Yes, there were.
Q. I think the jury has already heard from Detective Hartlove on most of those locations. We just need to go through with you very briefly the vehicles that were also searched on that day. Starting with the Ford Explorer -- and this is Government's series 21. Do you recall where that Ford Explorer was when it was searched?
A. The Explorer would have been at [redacted].
Q. And whose residence is that?
A. Mr. Ventura's.
Q. 21a?
A. Maryland license plate displaying 57157, Mike, 5.
Q. Is that a license plate relevant to the surveillance conducted in this case?
A. Yes, it is.
Q. 21b?

A. Tally sheets.
Q. 21e?
A. Cellular phone.
Q. 21c?
A. It looks like a receipt for Ashland, Virginia.
Q. And 21d?
A. It looks like a money remitter receipt from Jose Antonio Reyes to Lucia Reyes Escobar in El Salvador.
Q. I want to move on to the next vehicle that was searched on November 15th of 2010, and that was a Ford Expedition. Do you recall where that vehicle was on November 15th?
A. As I recall, that vehicle had left the residence with Yenis Ruiz operating it to pick up a child, and then subsequently came back when the -- once again, we had our Special Response Team execute the warrant at [redacted], and they found an unaccompanied minor in the house.
Q. Now, there is only one item of evidentiary value that was seized from the Ford Expedition. I'm going to place it on the screen for you. It's Government's 22a. What is that?
A. A tally sheet.
Q. There was also a Nissan Sentra that was searched on November 15th, 2010, or, actually, it was searched sometime thereafter. Can you explain why that was?
A. It was -- so we had a number of search warrants to execute, and we had ten days to execute them, and we couldn't

find the vehicle, so we found it on November 22nd. Through Detective Hartlove, it had been impounded in Annapolis.

Q. And was that vehicle searched at the time --

A. Once we --

Q. -- it was found?

A. Once we found the location, we found the vehicle. We went and we searched the vehicle pursuant to the search warrant, yes.

Q. Do you recall when that was?

A. Should have been November 22nd.

Q. And were items of evidentiary value seized from that Nissan Sentra?

A. Yes, they were.

Q. This is 23a.

A. It's a playing card with a hole punch.

Q. 23b?

A. Boxes of business cards.

**MS. YASSER:** I'm removing and publishing to the jury, Your Honor, one of the business cards seized from that box.

Q. 23c?

A. We know those to be homemade business cards for advertising prostitution. They were identified through the investigation.

Q. And then, finally, 23d?

November 15th, 2010.

Q. And, since we've been through Ventura Number 1 and Number 2 and the jury has heard extensive testimony on the connections between those phones, I'm going to turn your attention now instead to Page 2 of Government's 40f/1.

**MS. YASSER:** If I could have a moment, Your Honor.

**THE COURT:** Yes.

**BY MS. YASSER:**

Q. I want to direct your attention to the first three entries. What do the first three entries on this chart reveal?

A. They're associated with -- we're calling them Fuertes 1, 2, and 3 for Defendant Mr. Fuertes. Phone Number for Fuertes 1 is [redacted]-5015.

Q. And how primarily and why do you associate that number with Defendant Fuertes?

A. He was arrested with it. He gave and had the number on the September 25th, 2008 incident and the December 10th, 2008 incident with Mr. -- with Detective Hartlove.

Q. And was that phone number also saved on any of the phones that you recovered and analyzed over the course of the investigation?

A. Yeah. The phone that was recovered at [redacted] had that number saved as "Flaco."

Q. And do you recall when that phone was recovered at

[redacted]?

A. It would have been September 26th, 2008.

Q. Now, with respect to the next number on this chart, Fuertes Number 2, can you tell the ladies and gentlemen why you associated that number with Mr. Fuertes?

A. That was the phone in his possession when he was arrested on March 25th, 2009.

Q. By the way, speaking of Mr. Fuertes' arrest on March 25th of 2009, do you know if Mr. Fuertes was -- or that there were any Immigration consequences following that arrest?

**MR. MONTEMARANO:** Objection.

**THE COURT:** Basis?

**MR. MONTEMARANO:** Relevance.

**MS. YASSER:** It has to do with timing and location of this particular defendant.

**THE COURT:** Thank you. Overruled.

**THE WITNESS:** Yeah. An ICE detainer was lodged against him, and he -- which resulted in him coming into Immigration custody.

**BY MS. YASSER:**

Q. And was he detained in Immigration custody for any lengthy period of time?

A. He was detained, but he was placed in proceedings and eventually was released because he failed to appear for his Immigration proceedings and became an ICE fugitive.

**MR. MONTEMARANO:** Objection.

**MS. YASSER:** Again, for timing and location, Your Honor.

**MR. MONTEMARANO:** May we approach?

**THE COURT:** Come up.

(Whereupon, the following discussion occurred at the bench.)

**MR. MONTEMARANO:** Timing and location, well, let's cleverly get into the fact that my client failed to appear and blacken his name before the jury, as if the evidence wasn't doing a good enough job. Most respectfully, it didn't have to go there, and I request that the jury be instructed to disregard the response.

**MS. YASSER:** If I can, Your Honor, the Government's theory is that, after Mr. Fuertes was placed in deportation proceedings and failed to appear, that's when approximately he went to Virginia, and that's the reason that he went to Virginia is the Government's theory of the case.

**MR. MONTEMARANO:** It's a lovely theory which the Government is certainly entitled to argue on closing. In as much as there is no evidence -- there is not a single sighting of him there, there is not a single instance where they can link him to -- with these phones that are allegedly his a year after they last were in his possession, or ascribed to him, the only evidence we have he was even in Virginia was the

testimony of Ms. Franco yesterday.

**MS. YASSER:** Carlos Ascencio also testified that he'd seen Pacha, who is Fuertes, in Virginia.

**THE COURT:** Overruled.

(Whereupon, the bench conference was concluded.)

**BY MS. YASSER:**

Q. Special Agent Kelly, my last question had to do with Immigration consequences for Mr. Fuertes in the earlier part of 2009. Now, when Mr. Fuertes was released from ICE custody, was there some sort of tracking device on him?

A. Yeah. As I recall, he had a brace -- we have an alternatives to detention policy where, if possible, there is no violent crimes in their history, people that are subject to removal proceedings, we place on a bracelet with intensive monitoring. Because he came from a facility, that might have been one of the reasons to place that on him as opposed to just a straight removal, a release on recognizance, because he came through the criminal alien program. So, as I recall -- I reviewed the records a long time ago -- he was on a bracelet.

Q. And you mentioned that he didn't appear for court following this March 25th, 2009 arrest?

A. Correct. I believe that was April or May of 2009.

Q. Now, with respect to Fuertes Number 3, can you tell the ladies and gentlemen of the jury how you associate that phone with Mr. Fuertes.

A. Well, we had toll data on it, August and September of 2010. I believe the reason we obtained that toll data was because we saw a frequency with other target numbers in the investigation. Subsequently, he was identified by Ms. Fuertes as the number --

Q. Ms. Fuertes?

A. Pardon me. Ms. Dueñas for the -- for Mr. Fuertes when he was working in Virginia for Mr. Ventura, and then we also reviewed the phones. It was saved the same as Mr. Ascencio's. It was saved as "Juano" on Mr. Ascencio's phone with the similar testimony, and it was saved as "Flaco" on the phone that was recovered from [redacted] September 1st, 2009. In Mr. Ventura's Phones 1, 2, and 3, it was saved as "Pacha," "Norfo," and "Pinto." It was saved as "Flaco" on a phone recovered at [redacted] on November 15th, 2010. It was saved as "Chin" on the phone [redacted], which that phone was recovered November 15th, 2010, and Mr. Reyes was arrested with that phone on June 28, 2010.

It was saved on -- so the phone number for that is [redacted]-9346, and, between Mr. Reyes' arrest and what -- in June 28th of 2010 and when that phone was recovered on November 15th, 2010, that number had been erased.

Q. I want to show you finally what's been indicated as a number for Fuertes, Fuertes Number 5, and can you just tell the ladies and gentlemen of the jury how you associated that

number with Mr. Fuertes.
A. [redacted]-0076, Mr. Fuertes provided that himself on January 3rd, 2009 and March 25th, 2009 on the booking sheets.
Q. Now, there were a lot of phones seized over the course of this investigation. Were some of those phones associated with brothel locations --
A. Yes.
Q. -- that you identified?
I want to walk through now with you how you formed those connections between particular locations and brothels and phone numbers.
**MS. YASSER:** And this is -- for the record, this is Government's 40f/1, still Page 3.
Q. Mr. Kelly, or Special Agent Kelly, directing you to the first number, 8938, with what or where did you associate that number?
A. We associate that number with the brothel at [redacted].
Q. And how so?
A. There were business cards recovered in the Toyota Corolla that was searched on November 15th, 2010, and they were on Mr. Fuertes' person December 10th, 2008. The phone was recovered September 26th, 2008 at [redacted], and, at that time, law enforcement answered the phone of people who were calling in and asking for girls on the phone.

Q. Let's go to the next line, the number you associated with [redacted]. Can you tell us how you associate that number with that location?
A. [redacted]-1397, the subscriber for that is Amparo de Jesus Gonzalez, [redacted], Annapolis, Maryland. It was also a part of the subscriber records that another address was associated with that number, a [redacted], Capitol Heights, Maryland.
Q. What do you know that address to be? Whose residence?
A. Mr. Ventura.
Q. And then finally?
A. Then there were also business cards recovered from the Nissan Altima operated by Mr. Fuertes.
Q. The next location is [redacted]. Did you associate a phone number with that location?
A. [redacted]-1643.
Q. And how did you associate that?
A. Business cards for [redacted] were recovered from [redacted] on September 1st, 2009.
Q. And did that actually contain the address [redacted]?
A. I believe so.
Q. The next line is [redacted]. Can you tell me how you associated the number with that location?
A. That would be [redacted]-4630. Business cards were recovered pursuant to a search warrant at [redacted] on

July 7th, 2010. We also had done consensual calls to that number, and the phone itself was recovered at [redacted] on July 7th, 2010.

Q. And is that the same location that the jury heard the consensuals regarding the juvenile?

A. Correct.

Q. Is that in Easton?

A. Yes.

Q. The next line is [redacted], and there is four numbers that you associated with [redacted]. Can you walk the ladies and gentlemen of the jury through your associations.

A. First one is [redacted]-9346. The phone was recovered November 15th, 2010 at [redacted]. We had consensual phone calls, and Mr. Reyes was arrested with the phone on June 28th, 2010. There is other contact with that number associated with the investigation that's not in this chart.

Q. What's the next number that you associate with [redacted]?

A. [redacted]-2387, and that was recovered from Mr. Ventura's van on November 15th, 2010, and we had a consensual call to that number.

Q. [redacted] Number 3?

A. [redacted]-5211. There were consensual calls to that number. The bill from the Wireless shop dated 10/18/10, that says tossed by Reyes. That was the receipt recovered from the

trash.
Q. And then what about the fourth number associated with [redacted]?
A. [redacted]-8346. Two boxes of business cards were recovered from the Nissan Sentra on November 22nd, 2010 pursuant to the search warrant. Two receipts for phone recovered at Mr. Ventura's residence, which is [redacted] on November 15th, 2010, and a receipt for the phone and phone recovered November 15th, 2010 in the Astrovan operated by Mr. Ventura.
Q. The next line is the address of [redacted]. Where is that located?
A. That's in Portsmouth, Virginia.
Q. And what's the number you associated with that location?
A. [redacted]-1815.
Q. Why did you make that association?
A. We received the phone through the investigation that Agent Joseph was conducting in Norfolk. We received that phone number. We eventually placed a consensual phone call, and that number was located through -- in other ways in the investigation.
Q. And how was --
A. And as well as what's on the chart. In the consensual call in Norfolk, it was saved as "Chin" and "Chi Kitiguao" -- I don't know if I pronounced that correctly -- on the phones

recovered at [redacted] on July 7th, 2010, and was also saved as "Chim" -- it's "Chin" in Block 2, and "Chim" on Line 3 -- on the phone recovered November 15th, 2010 in the Astrovan operated by Mr. Ventura.

Q. Now, we've seen that name Chin before. Where did we see that?

A. That's a 4168, Fuertes 3.

Q. Now, continuing on with the two phone numbers associated with [redacted], can you explain why you made those associations?

A. The business cards, stamps, phones. So the business cards, the stamp to make the business card, and the phone for both those numbers were recovered from [redacted] or on the people that had stolen it from [redacted] on 2/17/10. So part of that whole incident on February 17th, 2010, those two phones were recovered at the address. They were on the business cards for the address, and they were that stamp to make the business cards.

Q. Now, after making these associations with the locations, did you check for frequency of contact between the Defendants and these particular locations?

A. Yes, we did.

Q. And did you also check for frequency of contact between the two defendants themselves, the various phones that were associated with them?

evidence is presented, I still anticipate that we will then get to closing arguments tomorrow, to jury instructions, and that the case, I hope, will be given to you to begin your deliberations tomorrow.

If you begin your deliberations tomorrow, instead of taking Friday off as I had planned, I'll bring you back in on Friday, and you can continue your deliberations on Friday. So just to have a sense of what you're going to be doing for the next few.

Again, please remember: Don't discuss the case among yourselves or with anyone else. Don't let anyone discuss the case with you. I will see you tomorrow morning. Please be in place at five minutes before 10:00 so that we can get started at 10:00 a.m. Again, the lawyers and I have some work to do at 9:30, so you benefit somewhat by having a half-hour later start, but let me assure you we will be using that time. So we'll see you tomorrow morning at 10:00 -- 10:00 tomorrow. Please be in place at five of 10:00 for a 10:00 a.m. start. 10:00 tomorrow. Good night.

**JUROR:** Thank you.

**JUROR:** Yes, thank you.

(Laughter.)

**THE COURT:** Okay. Your second early day home from school, isn't it?

**JUROR:** It is. It's a snow day.

(Jury excused.)

**THE COURT:** Thank you. You may be seated. You may step down.

**THE WITNESS:** Thank you, sir.

(Witness excused.)

**THE COURT:** Subject to review of documents and hands-on with the evidence, I understand the Government has rested?

**MR. CUNNINGHAM:** That is correct, Your Honor.

**THE COURT:** Counsel, motions?

**MR. RUTER:** Your Honor, we would move for judgment of acquittal as to all seven counts as to Mr. Ventura; however, Your Honor, given the record, I will submit without argument.

I would say this, Your Honor. This came in the form of one of our motions *in limine*. It is our position that, as to Count 6, the only thing that is relevant is whether or not Mr. Ventura had enticed or forced or coerced Ms. Franco to engage in prostitution.

In that regard, I realize, reviewing the evidence in the light most favorable to the Government, there is most likely enough evidence to have that go forward, but it's our position that, if she was involved in prostitution, it was not as a result of any force or enticement or coercion of Mr. Ventura, and, with that, Your Honor, I would submit.

**THE COURT:** I anticipate hearing more about that during the instructions conference as well.

**MR. RUTER:** I think so.

**THE COURT:** Mr. Montemarano, motions on behalf of Mr. Fuertes?

**MR. MONTEMARANO:** Thank you, Your Honor. With regard to the three counts, I'm going to talk about them in reverse order. As to Count 6, there is no evidence of force, fraud, and coercion undertaken by Mr. Fuertes or aided and abetted by Mr. Fuertes. The most we see was his presence when there was physical violence directed towards Ms. Dueñas Franco -- Rebeca -- who testified yesterday and the day before, that he was aware of this having happened on one occasion. I respectfully submit it's simply not enough to establish that in the very terms of the instruction.

As to the transport count --

**THE COURT:** Let me ask the Government about Count 6 first of all.

**MR. MONTEMARANO:** Sure. That would be fine.

**THE COURT:** Count 6, evidence as to Mr. Fuertes?

**MR. CUNNINGHAM:** Your Honor, I think that there was evidence that he received pay from Ventura, and certainly financial benefit is a predicate or one of the components of that violation.

**THE COURT:** Did she, Ms. Franco, not testify that

she had no fear of Mr. Fuertes?

**MR. CUNNINGHAM:** She did testify to that effect, Your Honor. One of the things that we were going to ask the Court during the charge conference -- and I suspect we'll speak more to it during that session, but, to the extent that a reckless disregard instruction would be given to the jury in light of the testimony that he was present when she, you know, was beaten, that it was in the context of her performing as a prostitute, and this was an enterprise from which Mr. Fuertes did derive a financial benefit, that, in fact, his complicity is, in fact, shown by that testimony and that evidence.

**THE COURT:** Okay. So benefit with knowledge, you say, is sufficient on Count 6?

**MR. CUNNINGHAM:** Yes, Your Honor.

**THE COURT:** Okay. Thank you.

**MR. MONTEMARANO:** I respectfully submit that it is simply not where the knowledge is so abbreviated, so attenuated, so focussed, one instance. There has to be some sort of course of conduct. The Government simply cannot bootstrap overarching knowledge out of one incident when Ms. Dueñas, Ms. Franco, doesn't suggest that. She suggested that he treated her well, he did not mistreat her, he did not abuse her, he did not restrain her. He did none of the things which the elements set out in the instruction call for, which is the reason I cross-examined her in that very vein.

I respectfully submit the Government simply has not made force or fraud or coercion from Mr. Fuertes directed toward Ms. Franco, and we would respectfully request that the Court grant the motion.

For the record, my client will not be putting on a defense, so we would ask that the Court's ruling be, in essence, as we will be making it in a renewed fashion after we rest.

**THE COURT:** Okay. Your next argument?

**MR. MONTEMARANO:** As to the transport count, once again, from the terms of the instruction, there is no suggestion that he aided and abetted transport. He did not transport the girls in interstate commerce. He was not involved in picking them up at the bus station, for example, buying tickets, nothing of that sort.

The perfect example of the rather clear bifurcation is the photograph we were shown in evidence earlier today -- I believe it's in the 40s -- of the silver Expedition, the woman in the pink shirt getting out down in Portsmouth. Mr. Fuertes never did any anything of that sort, and he's not observed at any time doing anything of that sort.

I respectfully submit that the Government has not made the transportation count, the Mann Act count.

**THE COURT:** Anything further?

**MR. MONTEMARANO:** We would submit as to Count 1 of

the § 371 conspiracy.

**THE COURT**: Okay. I think there is sufficient evidence to get to the jury, so the motions will be denied, although I do understand the arguments you will be making, Mr. Montemarano.

Mr. Ruter, please advise your client.

**MR. RUTER**: Yes, Your Honor.

Mr. Ventura, do you want to stand up, please.

Mr. Ventura, you have a right in this case to testify if you choose, or not to testify if you choose. If you were to decide not to testify, Judge Quarles would advise the jury that they could not think anything badly about you, that they couldn't draw any what they call an inference -- any negative inference or belief that, as a result of your not testifying, that you're trying to hide something from them.

In the event that you were to decide to testify, what would happen is I will question you. You'll be sitting right over there on the witness stand. I will direct your examination, and, after I am completed with my examination, the prosecutors, either Mr. Cunningham or Ms. Yasser, would have an opportunity to cross-examine you as to all matters that I have questioned you about and any other matters that Judge Quarles believes to be relevant and proper under the laws of this country and given the facts of this case.

**THE COURT**: Mr. Ruter, let me interrupt you now to

inquire of the Government whether it has convictions with which it intends to impeach Mr. Ventura?

**MR. CUNNINGHAM:** No, Your Honor.

**THE COURT:** Thank you.

**MR. RUTER:** Okay. And, Mr. Ventura, His Honor just asked the Government if you had any convictions -- any criminal convictions which they might wish to bring to the jury's attention so as to impeach you. They have answered that there are no such convictions. Therefore, if you had been convicted of any other crime -- if you had been, it will not be brought up in this courtroom.

Do you understand that so far?

**DEFENDANT VENTURA:** Uh --

**MR. RUTER:** I'm not quite done yet. Do you understand what I've just said so far?

**DEFENDANT VENTURA:** If you don't let me talk, how am I going to talk?

**MR. RUTER:** All right. That's a fair -- that's a fair comment.

The last thing I do want to say, Mr. Ventura, is, a couple of Saturdays ago, did you and I have occasion to meet and to discuss this very topic, as to whether or not you wished to testify or not to testify?

**DEFENDANT VENTURA:** Sir, I have to question, back in March -- March 27th, how many months it had been since you had

even seen me or seen my face? You said you didn't know. I am going to testify in front of the Grand Jury --

**INTERPRETER GOLDSTEIN:** The Interpreter was questioning as to the use of "Grand Jury," Your Honor.

**DEFENDANT VENTURA:** I have never had the opportunity to be prepared for this case, and never has Mr. Cunningham or the prosecutors ordered for the evidence to be given to me so that I could prepare for this case. I never heard the CDs. I never heard the testimony of Ms. Franco either. Photos of supposedly something with Ms. Franco -- it looked like an infection of some kind, but I actually see that those pictures must have been pictures of men.

**THE REPORTER:** I'm sorry. Must have been?

**INTERPRETER GOLDSTEIN:** "Must have been pictures of men."

**DEFENDANT VENTURA:** Those are false pictures.

I sent 20, 25, to 50 letters throughout the 28 months since I've been arrested, and no defense attorney has ever sat down with me to go over the evidence. Only thing I've been told is, "Just remain silent. When it's your turn, you can talk." When I'm dead, how can I talk? I was never given the chance. Not just necessarily the attorney who is here and is representing me in this case, but before him. I want to say that, before any of them -- I would certainly hope that all this is being recorded. And I think that they have

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Docket No. WDQ-10-0770 Volume VIII |
| GERMAN de JESUS VENTURA and KEVIN GARCIA FUERTES, Defendants | |

Baltimore, Maryland
April 18, 2013
9:30 AM to 5:24 PM

**THE ABOVE-ENTITLED MATTER CONTINUED ON FOR JURY TRIAL**
**BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**

A P P E A R A N C E S

On behalf of the Government:

Michael Cunningham, Assistant U.S. Attorney
Rachel Yasser, Assistant U.S. Attorney

On behalf of Defendant German de Jesus Ventura:

Gerald Ruter, Esquire

On behalf of Defendant Kevin Garcia Fuertes:

Michael D. Montemarano, Esquire

A P P E A R A N C E S (CONT.)

Also present:

HSI Special Agent Edward Kelly
Victoria Kirchgessner, Spanish Interpreter
Marta Goldstein, Spanish Interpreter
Shelley Lorenzana-Blumberg, Spanish Interpreter

Reported by:

Martin J. Giordano, RMR, CRR, FOCR
U.S. Courthouse, Room 5515
101 West Lombard Street
Baltimore, Maryland 21201
410-962-4504

because I have no other option.

**THE COURT:** Thank you.

Mr..Ruter, since the Defendant has not, in unmistakable terms, asserted the right of self-representation, you are -- I hate to do this to you -- still in as counsel for Mr. Ventura.

Okay. Folks, please turn to the jury instructions, and let me know when you're ready.

**MS. YASSER:** The Government's prepared, Your Honor.

**THE COURT:** Thank you.

**MR. RUTER:** Yes, Your Honor.

**MS. YASSER:** And I have handed up for Your Honor's consideration a jury instruction that we discussed yesterday with respect to --

**THE COURT:** Is this willful blindness or something like that?

**MS. YASSER:** Yes, sir.

**THE COURT:** Okay. The Government's objections to Court's Instruction 1?

**MS. YASSER:** No objection, Your Honor.

**THE COURT:** Mr. Ruter, Court's 1?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano, Court's 1?

**MR. MONTEMARANO:** No.

**THE COURT:** Court's 2, Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Government?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Court's 3, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter, I will, of course, need this for Mr. Fuertes, and I will await the decision when we get to the jury as to whether the next will be called.

Any objection, Mr. Montemarano, to Court's 3?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Court's 4, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** I assume you've got no objection.

Mr. Ruter, again, I will hear from the Defendant before making this decision.

**MR. RUTER:** Yes.

**THE COURT:** Government, objection to Court's 4?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Court's 5, objections from the Government?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Court's 6, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Ms. Yasser?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Court's 7, Ms. Yasser?

**MS. YASSER:** No objection.

**MR. RUTER:** No, sir.

**MR. MONTEMARANO:** No.

**THE COURT:** Court's 8? Let me ask, first of all, are there stipulations in this case?

**MS. YASSER:** There are not.

**THE COURT:** Okay. Then Court's 8 is out.

Court's 9, Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No. No, sir.

**MS. YASSER:** No, Your Honor.

**THE COURT:** Government?

Court's 10, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** Nope.

**THE COURT:** Let me start with the Government on Court's 11? Are you going to argue silence is admission?

**MS. YASSER:** It sort of depends on possible testimony, I believe, Your Honor.

**THE COURT:** Okay.

(Counsel conferring.)

**MS. YASSER:** Okay. We don't believe this instruction is necessary, Your Honor.

**THE COURT:** Okay. Anyone who believes it's in, necessary?

**MR. MONTEMARANO:** No, Your Honor.

**MR. RUTER:** No, Your Honor. That's fine.

**THE COURT:** Court's 11 is out.

Court's 12, Mr. Montemarano?

**MR. MONTEMARANO:** Okay by us.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** Agreed.

**THE COURT:** Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Court's 13, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** Your Honor, if I could just say this. I don't believe that any opinion was ever given by the expert, Dr. Baker. It was a "by my experience," which is rather considerable, Your Honor. I've never had an expert give the kind of, quote, opinion, unquote, that Dr. Baker did, and I don't think that it should be included, because she did not give a professional opinion.

**THE COURT:** Okay. I understand that you have an objection to it. Your objection is noted.

Mr. Montemarano, are you joining?

**MR. MONTEMARANO:** Not only would I join, but I would also object to the phrasing of the instruction in the plural. Dr. Baker was the only expert, as far as I recall, and, therefore, there is at least -- there could be some confusion on the part of the jury that somebody else was an expert.

**THE COURT:** Okay. We'll change it to "a witness" and indicate throughout, through the grammar, that the reference is to one witness.

**MR. MONTEMARANO:** On the part of Mr. Fuertes, we actually would prefer that Dr. Baker be referenced by name -- "a witness, Dr. Baker, as an expert," so that it focuses the jury appropriately.

**MR. RUTER:** No objection, Your Honor.

**THE COURT:** Hearing no objection, we will include that.

Let me ask: Government, are you going to argue an admission, Number 14?

**MS. YASSER:** Again, this would be -- I guess the answer is, "No," Your Honor. There would be prior inconsistent statements potentially, not admissions.

**THE COURT:** Okay. That's out.

Fifteen, Mr. Montemarano?

**MR. MONTEMARANO:** Fifteen? Fine, Your Honor.

**THE COURT:** Fifteen, Mr. Ruter?

**MR. RUTER:** No objection, sir.

**THE COURT:** Fifteen, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Sixteen, Ms. Yasser?

**MS. YASSER:** Your Honor, let me just pause for a moment at 15. No objection.

Sixteen, no objection.

**THE COURT:** Okay. Mr. Ruter?

**MR. RUTER:** None.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** Nope.

**THE COURT:** Seventeen, let me start with Government. You're going to argue prior inconsistent statement, Government?

**MS. YASSER:** Potentially if the Defendant testifies.

**THE COURT:** Okay. But this is, again, optional

based on the testimonial decision?

**MS. YASSER:** I believe that, in terms of the Government's case, yes, but I do believe that the Defense did also impeach on prior inconsistent statement, so it would be no objection on the basis of that.

**THE COURT:** Having it in? Okay.

Mr. Ruter?

**MR. RUTER:** Yeah. We did impeach, Your Honor. We would ask this.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** We join.

**THE COURT:** Okay. Eighteen, Mr. Montemarano?

**MR. MONTEMARANO:** Well, I would object for the record, because I hate this instruction, but I understand that it's in the pattern. I don't object to the form of it. I just object to the giving of it. Is that --

**THE COURT:** I'm inclined to strike the first parenthetical, for example, which is a reference to fingerprints and transmitting devices. Any objection from anyone if I do that?

**MS. YASSER:** No objection, Your Honor.

**MR. RUTER:** No, sir.

**THE COURT:** And, on the second parenthetical, I would leave the reference to recordings, but strike the reference to fingerprints.

**MS. YASSER:** Yes, Your Honor.

**MR. RUTER:** Agreed, Your Honor.

**THE COURT:** So it would be, "no requirement to offer recordings." We try to pull out "tape" wherever it's there. These are obviously very old instructions when we had tape recorders.

Number 19, Mr. Montemarano?

**MR. MONTEMARANO:** No problem.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Ms. Yasser?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Number 20, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No objection. And, as a matter of clarity, Your Honor indicated earlier, I think during the motions hearing, that you won't be sending the Indictment back?

**THE COURT:** That has been my practice unless all the parties agree that it goes back. I'm essentially going to end up reading them the Indictment in the instructions anyway. Thanks a lot, folks, for drafting a long Indictment.

**MR. MONTEMARANO:** Will you be sending the instructions back in written form?

**THE COURT:** Yes.

**MR. MONTEMARANO:** Then fine. Thank you, Your Honor.

**THE COURT:** Okay.

**MR. MONTEMARANO:** No problem with 20 --

**THE COURT:** Mr. Ruter, 20?

**MR. RUTER:** No, sir.

**THE COURT:** Government, 20?

**MS. YASSER:** No objection.

**THE COURT:** Twenty-one, Government?

**MS. YASSER:** No objection, Your Honor.

**THE COURT:** Twenty-one, Mr. Ruter?

**MR. RUTER:** No.

**THE COURT:** Twenty-one, Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Twenty-two, Mr. Montemarano, all 900 pages of it?

**MR. MONTEMARANO:** As I recall, there was -- I'm trying to figure out where this one ends. That's my only concern.

**THE COURT:** It ends on Page 42.

**MR. MONTEMARANO:** Yes. I don't believe there was an objection on our part.

**THE COURT:** Okay. Mr. Ruter?

**MR. RUTER:** No objection.

**THE COURT:** Government?

**MS. YASSER:** No objection, Your Honor.

**THE COURT:** Twenty-three, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Twenty-four, Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Government?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Ms. Yasser, 25?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Twenty-six, Mr. Montemarano?

**MR. MONTEMARANO:** Yes, Your Honor. On Page 50, 5-0, we would reiterate our objection to the second full paragraph on that page, beginning, "Thus," which was referenced in my

proposed jury instruction objections to the Government's initial proposed instructions.

**THE COURT:** Okay. You have your objection.

**MR. MONTEMARANO:** Thank you, Your Honor.

**THE COURT:** Mr. Ruter, are you joining?

**MR. RUTER:** I am, sir.

**THE COURT:** Very good.

Government, any objection?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Okay. The instruction stands as objected to.

Number 27, Mr. Montemarano?

**MR. MONTEMARANO:** No objection, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection.

**THE COURT:** Government?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Number 28, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Twenty-nine, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Government?

**MS. YASSER:** No objection.

**THE COURT:** Thirty, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** Your Honor, I think there will be, which Mr. Montemarano would probably take the lead on explaining.

**THE COURT:** Mr. Montemarano, as to 30, objections?

**MR. MONTEMARANO:** Yes, Your Honor. It's our view, based upon the language in Sand & Siffert, that there is a requirement that a particular individual be identified with regard to this. Our view is that there must be the moving not generally, but of a person, and the jury must be unanimous as to a person having been transported to fulfill this.

For the sake of discussion, Your Honor -- I'm not suggesting evidence suggests this or anything else -- we heard evidence about Ms. Dueñas and Ms. Santiago, both of whom were admitted to having been prostitutes for Mr. Ventura. If half the jury believed Ms. Dueñas was moved, or Ms. Franco, and half the jury felt Ms. Santiago had been moved, that would not be unanimity for the purpose of the statute and, therefore, the --

**THE COURT:** I take your point, and I will make one

editorial addition so that it is clear that the jury must agree that the same individual -- all the jury must agree that the same individual was moved.

Any objection, Government?

**MS. YASSER:** Well, the only fear, Your Honor, is that that might impliedly suggest that the jury has to know the individuals and/or the identity of the individuals, which is very clearly not the case.

**THE COURT:** I understand that, but, again, he does have a unanimity argument, which has some weight, I think.

**MS. YASSER:** Yeah. I mean, I see his point, and it's well taken. I just want to make sure that it's carefully scripted so as --

**THE COURT:** It will also -- the instruction will also indicate that this does not mean that the jury must know the identity of the individual that they find to have been moved in interstate transportation, but all of them must agree that a particular, or all of them must agree on the particular individual that they find has been moved.

**MS. YASSER:** I'm sorry. On the particular transportation? The unit is the transportation.

**THE COURT:** Yes, the transportation.

Anyone else want to be heard on 30?

**MR. MONTEMARANO:** Not for the Defense, Your Honor. Thank you.

**MR. RUTER:** Thank you, Your Honor. No.

**THE COURT:** Okay. Knowingly, Government, 31?

**MS. YASSER:** No objection, Your Honor.

**THE COURT:** Mr. Ruter, 31?

**MR. RUTER:** No, sir. No, sir.

**THE COURT:** Mr. Montemarano, 31?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Montemarano, 32?

**MS. YASSER:** I apologize, Your Honor. I do feel that this would be possibly the appropriate place to discuss deliberate indifference.

**THE COURT:** Okay. I will review the instruction, and, if I determine that it will be given, it will be given after 31. It will be the new 32. And of course I will give you all a chance to be heard on it, and I have not decided that it goes in, but, if it goes in, that's where it would go.

Anyone wish to be heard on 32, an objection?

**MR. RUTER:** Not from Mr. Ventura.

**MR. MONTEMARANO:** No, Your Honor.

**MS. YASSER:** No, Your Honor.

**THE COURT:** Thirty-three, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Government?

**MS. YASSER:** No, Your Honor.

**THE COURT:** Thirty-four, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** I'm not sure the purpose to this based upon the evidence that's been adduced, Your Honor. I have not --

**THE COURT:** Is anyone going to argue it? I assume the inarguable motive here is money?

**MS. YASSER:** Yes, Your Honor.

**THE COURT:** Which is clear.

**MR. MONTEMARANO:** Is that an understood coefficient of one in human affairs.

**THE COURT:** Any objection to my striking of 34?

**MR. MONTEMARANO:** Not by Mr. Fuertes.

**MS. YASSER:** No, Your Honor.

**MR. RUTER:** No, Your Honor.

**THE COURT:** Thirty-four is out.

Thirty-five, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Thirty-six, Mr. Montemarano?

**MR. MONTEMARANO:** Just for the record, Your Honor, I've got no objections through 39. I'm not charged in that count.

**THE COURT:** Okay.

**MR. RUTER:** No objection, Your Honor.

**THE COURT:** Government, 36?

**MS. YASSER:** Yes, Your Honor. I believe we had one addition, if I could address it. Just a definition. I think there was argument by Mr. Ruter, an attempt to elicit some line of questioning regarding the enticement or inducement language, and so I think it would be appropriate to provide a definition of "induce," which we've provided in our response to the Defendant's objections, and it's from *United States versus Daniels*, and it's a definition that "induce" can be defined as to lead or move by influence or persuasion, to prevail upon, or, alternatively, to stimulate the occurrence of; to cause.

And the reason that that's important is because this particular count has to do with Mr. Ventura's enticement of Margarita Santiago, a woman who was, by all accounts, a voluntary participant in the prostitution trade, but, by offering her work in Maryland, that is what, in fact, enticed her or induced her to come to Maryland. It's important that

the jury understands that voluntariness is not at issue here, that "induce" can just mean to cause.

**THE COURT:** Okay. Any objection to the addition?

**MR. RUTER:** No, Your Honor. I understand.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Thirty-seven, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Thirty-eight, Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** I think we might have ventured into -- any objection?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Thirty-nine?

**MS. YASSER:** No objection.

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Forty, you said this is -- forty, Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Any objection?

Forty, Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Forty, Government?

**MS. YASSER:** No objection.

**THE COURT:** Ms. Yasser, 41?

**MS. YASSER:** No objection. Oh, wait a minute. Yeah. No objection.

**THE COURT:** Mr. Ruter, 41?

**MR. RUTER:** Your Honor, as to 41, although it may be more appropriate as to Number 43, but, just to make sure that's -- I have a chance to discuss it, Your Honor, what I am concerned about is the fact that there has been evidence adduced from other witnesses other than Ms. Franco that deal with the issue of force or fraud or coercion, and it's my position that, as to Count 6, which alleges only conduct of Mr. Ventura relative to Ms. Franco that the jury instructions have to be fashioned as to Ms. Franco.

So, as an example, Your Honor, if there was any testimony of any force or fraud or coercion of another person and Ms. Franco didn't know about it, then it couldn't be

considered against Mr. Ventura as it relates to Ms. Franco in Count 6, and I am concerned not only about Instruction 41; the same would apply to 42, and the same would apply to 43, because they're all specific as to Ms. Franco. And I'm very concerned, as an example, Your Honor, which this is more akin to perhaps 42 or 43, taking --

**THE COURT:** Any objection, Government, to limiting 41 to Ms. Franco?

**MS. YASSER:** No, Your Honor. It is with respect to Ms. Franco, and, actually, I think Mr. Ruter makes a good point, and the Government did propose language in its initial instructions to get to this, and, if I can quote from it, Your Honor, you might find it appropriate. It has to do with both a climate of fear in general, but also Mr. Ruter's concern that the jury only consider the acts to which she was aware, and this is the language: You may also consider whether the Defendant's conduct gave rise to a climate of fear that overcame the will of the alleged victim. A climate of fear that overcame the will of the victim may arise not only from a defendant's threats and other acts directed at the victim herself, but also from conduct directed at others of which the victim is aware.

**MR. MONTEMARANO:** The Court's indulgence.

What page is that?

**MS. YASSER:** It's Page 40 and 41 of the Government's

initial suggestion.

**MR. MONTEMARANO:** The Court's indulgence, if Mr. Ruter and I could consult.

(Counsel conferring.)

**MR. RUTER:** Your Honor, if I could say, I haven't reviewed that in detail, but I do want the Court to know that part of what I'm really concerned about is this atmosphere of fear in that what it's going to do, I think --

**THE COURT:** If you have an objection to the Government's proposal --

**MR. RUTER:** Oh, I do.

**THE COURT:** -- it is sustained; however, we will limit it to Ms. Franco.

**MR. RUTER:** Your Honor, could I also suggest some language to the Court, because, quite frankly, I was hoping to have a little bit clearer understanding for the jury as relates to 41, 42, and 43? And that language, Your Honor, which is in my hen scratching, says that you may have heard testimony concerning alleged acts -- alleged specific acts of violence or threats of violence not directed at the witness, Rebeca Dueñas Franco. You are instructed that such evidence, if any, is to be considered by you only for purposes of determining guilt or innocence as to Count 1 only, unless you find that such evidence of acts -- such specific acts of violence or threats of violence were known to Rebeca Dueñas

Franco. Only if you find that such specific alleged acts of violence or threats of violence were known to Rebeca Dueñas Franco may you consider such evidence and the weight to give such evidence, if any, in considering the guilt or innocence of Mr. Ventura as it relates to Count 6.

**THE COURT:** Is the Government joining the request?

**MS. YASSER:** No, Your Honor.

**THE COURT:** It is denied.

**MR. CUNNINGHAM:** Your Honor --

**THE COURT:** Yes?

**MR. CUNNINGHAM:** May I just step out momentarily, Your Honor?

**THE COURT:** Sure. Forty-two, Government?

**MS. YASSER:** Yes, Your Honor. It just appears, with respect to the first element of the offense, while the "benefit financially" language was included in Instruction 41, it appears to be omitted from 42. There is an alternative here. The first element of the offense, as reflected in Instruction 41, is that the Defendant either knowingly recruited, enticed, harbored, transported, provided, or obtained a person by any means, or benefited financially or by receiving anything of value from participation in such a venture. So Instruction Number 42 should reflect that same alternative.

**THE COURT:** We will find an appropriate place for

the financial value. The financial benefit, rather, and I'm not sure it's here.

**MS. YASSER:** Your Honor, it is the first element of the offense, and I think that's where we are with 42. Again, the statute reads -- and I can pull the Indictment if you give me a moment, but there is essentially two alternative ways to meet the first element of a § 1591 charge. First is by actually doing the harboring, recruiting, obtaining, or maintaining on your own, and the second way is to simply benefit financially from a venture engaged in that activity, and that is actually the Government's theory as to the first element with respect to Fuertes.

**THE COURT:** Okay. I will include it, then.

**MS. YASSER:** Thank you, Your Honor.

**THE COURT:** Defense, 42?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir. The same -- I would ask the same instruction, Your Honor, as to 42 as to 41, which the Court has denied.

**MR. MONTEMARANO:** Subject to those --

**THE COURT:** Okay.

**MR. MONTEMARANO:** -- prior objections.

**THE COURT:** Yes, they are included.

Forty-three, Mr. Montemarano?

**MR. MONTEMARANO:** No, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** Of course just the same objections already noted, Your Honor.

**THE COURT:** Yes.

Ms. Yasser, 43?

**MS. YASSER:** I would like the opportunity to just argue very briefly for a couple legal requirements that I think the jury would benefit from hearing, and I think the first has to do with the use of this climate of fear with respect to Ms. Dueñas, and that's *U.S. v. Harris* and *U.S. v. Booker*, which essentially establishes that it's enough to show that the Defendant's use of threats, force, fraud, deception, or coercion were sufficient to compel or were sufficient to give rise to a climate of fear that would compel a reasonable person in the alleged victim situation to comply with the Defendant's demands in light of the totality of the Defendant's conduct, the surrounding circumstances, and any vulnerabilities of the victim. That's number one.

The second one has to do with escape, Your Honor, and I imagine that the Defense would be arguing that Ms. Dueñas had an opportunity to escape and they should consider that in deciding whether force, fraud, or coercion was used, and the case law is clear with respect to involuntary servitude cases that the Government does not need

prove physical restraint, such as the use of chains, barbed wire, or locked doors, in order to establish the offense of sex trafficking. The fact that an alleged victim may have had an opportunity to escape is irrelevant if the Defendant placed her in such fear or circumstances that she did not reasonably believe she could leave. A victim is under no affirmative duty to escape.

**THE COURT:** Okay.

**MS. YASSER:** And then, finally, with respect to the initial voluntariness of a victim of sex trafficking, in this particular case, Ms. Dueñas was already engaged in prostitution when she met the Defendant. I think it's important for the jury to know that the fact that an alleged victim may have initially acquiesced in prostitution does not preclude a finding that the victim was compelled to perform the sexual acts thereafter.

**THE COURT:** Okay. Mr. Ruter, are you joining the Government's change?

**MR. RUTER:** I am not.

**THE COURT:** Okay. It is denied.

Forty-four, Government?

**MS. YASSER:** No objection, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection, Your Honor.

**THE COURT:** You're not in, Mr. Montemarano?

**MR. MONTEMARANO:** Oh, we're good, Your Honor. I'm sorry.

**THE COURT:** Forty-five?

**MR. RUTER:** No objection from -- I'm sorry, Your Honor.

**MR. MONTEMARANO:** Your Honor, we would object to the references in the instruction to specific forms of conduct. Transporting a person across state lines for a commercial purpose is conduct in interstate commerce.

**THE REPORTER:** I'm sorry. One more time. One more time.

**MR. MONTEMARANO:** Transporting a person across state lines for a commercial purpose is conduct in interstate commerce. That is Sentence 2 of Paragraph 2.

Likewise, the last sentence, for example, the use of hotels that service interstate travelers or the use of condoms that traveled in interstate commerce --

**THE REPORTER:** I'm sorry. I can't -- a little slower.

**MR. MONTEMARANO:** For example, the use of hotels that service interstate travelers or the use of condoms that traveled in interstate commerce is conduct that affects interstate commerce. Mr. Ruter already explained movement of persons, movements of goods. I think the instruction is otherwise adequately clear.

**THE COURT:** Mr. Ruter, are you joining?

**MR. RUTER:** I'm happy to join, Your Honor, yes.

**THE COURT:** Is the Government joining?

**MS. YASSER:** No, Your Honor.

**THE COURT:** It is denied.

Forty-six, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection, Your Honor.

**MR. MONTEMARANO:** No objection from Mr. Fuertes there. The firearm doesn't apply to him.

**THE COURT:** Forty-seven, I assume same, Mr. Montemarano? No objection?

**MR. MONTEMARANO:** Yes, sir.

**THE COURT:** Forty-seven, Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Government?

**MS. YASSER:** No objection.

**THE COURT:** Forty-eight, Government?

**MS. YASSER:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection, sir.

**MR. MONTEMARANO:** No objection.

**THE COURT:** Forty-nine, Mr. Montemarano?

**MR. MONTEMARANO:** No objection.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No objection.

**THE COURT:** Government?

**MS. YASSER:** No objection.

**THE COURT:** Fifty, Government?

**MS. YASSER:** No objection.

**MR. RUTER:** No, sir.

**THE COURT:** Mr. Ruter?

**MR. MONTEMARANO:** No objection, Your Honor.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** No.

**THE COURT:** Final instruction, Mr. Montemarano?

**MR. MONTEMARANO:** No objection, Your Honor.

**THE COURT:** Mr. Ruter?

**MR. RUTER:** No, sir.

**THE COURT:** Ms. Yasser?

**MS. YASSER:** No objection.

**THE COURT:** Now, you have the draft for me of something?

**MS. YASSER:** I do, Your Honor. I handed it up to your trusty law clerk. It's a draft of the deliberate conscious avoidance or deliberately closing your eyes instruction. If you'd like another copy, I can hand that up.

**THE COURT:** Oh, by the way, in the instructions, we referred, as the Indictment refers, to "RDF." Is there anyone

here who wants the full name used?

**MS. YASSER:** That would be fine, Your Honor. It doesn't --

**MR. RUTER:** We'd like it to be used.

**THE COURT:** We'll use full name.

**MS. YASSER:** And I do have one thing with regard to the verdict sheet.

**THE COURT:** Okay.

**MS. YASSER:** With respect to Question 1 --

**THE COURT:** Wait a minute.

**MR. MONTEMARANO:** Of which one, Ms. Yasser?

**MS. YASSER:** This is the verdict form.

**MR. MONTEMARANO:** Which one? There are separate ones with --

**MS. YASSER:** Oh, I'm sorry. It's with respect to both of them. It's the conspiracy count.

**MR. MONTEMARANO:** Oh.

**THE COURT:** Yes?

**MS. YASSER:** It actually -- and I always confuse these words -- the disjunctive versus the conjunctive. It has an "and," and it should be an "or," between "conspiracy to transport an individual," or -- and it should say, "or to --"

**THE REPORTER:** A little slower, because I don't have it in front of me. I'm sorry.

**MS. YASSER:** I apologize. The instruction reads, or

the verdict form reads, "How do you find the Defendant as to Count 1, conspiracy to transport an individual in interstate commerce for prostitution, an illegal sexual activity, and to persuade, induce, entice," et cetera. That should read "or." Those are two different objectives of the conspiracy, and both need not be met.

**THE COURT:** Okay.

**MS. YASSER:** And then, with respect to Question 2, which, again, applies to both defendants, I believe it should say, "from on or about September 2008 through March 2009."

**THE COURT:** Defense?

**MR. RUTER:** Your Honor, we don't think there is any necessity of changing 1 or 2. As to Page 2, however, Your Honor --

**THE COURT:** Yes?

**MR. RUTER:** -- we would request language following Number 6 that indicates that, in the event that you find Mr. Ventura not guilty of Count 6, then you need not consider, or, rather, you must find him not guilty of Count 7, since Count 7's object is Count 6.

**THE COURT:** Government?

**MS. YASSER:** I don't know that I have any objection to some language of that sort. Obviously, if the jury came back and had checked 7 without checking 6, we would have a problem.

**THE COURT:** Okay.

**MR. RUTER:** Thank you, Your Honor.

**THE COURT:** So we will stop the deliberation if the -- if the answer is not guilty to 6, they need not consider 7?

**MS. YASSER:** That's correct.

**THE COURT:** Okay. Now, the Government proposal, Madam Clerk?

**MS. YASSER:** If I may, Your Honor, I can approach with that?

**THE COURT:** Yes, thank you.

(Document tendered to the Court.)

**THE COURT:** Thank you.

Any objection, Mr. Ruter?

**MR. RUTER:** Your Honor, I have no objection, but it's not relevant, quite frankly, as to Mr. Ventura.

**THE COURT:** Mr. Montemarano?

**MR. MONTEMARANO:** I would object in most uncertain terms, Your Honor, if I could.

**THE COURT:** Uncertain?

**MR. MONTEMARANO:** I submit to the Court that this constitutes an impermissible reduction of the Government's burden. Conscious avoidance is not the standard. I invite the Court's attention to the present. Can Your Honor see this on the full screen?

**THE COURT:** Yes.

**MR. RUTER:** Because I've only got a mini screen back here, so I want to make sure you can see it. If you look, Your Honor, where I am pointing with my pen, "Even if the evidence does not establish actual knowledge, this element is satisfied if you find the Government --"

**INTERPRETER GOLDSTEIN:** Excuse me. The Interpreter requests --

**MR. MONTEMARANO:** I know.

**INTERPRETER GOLDSTEIN:** -- that the attorney not --

**MR. MONTEMARANO:** My bad. Let me start again.

**INTERPRETER GOLDSTEIN:** -- speak so fast. Thank you.

**MR. MONTEMARANO:** "Even if the evidence does not establish actual knowledge, this element is satisfied if you find that the Government has proved, beyond a reasonable doubt, that the Defendant acted with reckless disregard of the facts concerning the use of coercion."

Reckless disregard is a higher standard than conscious avoidance, Your Honor, and, by the Government suggesting that conscious avoidance as the standard, they are diminishing their burden of proof. If the Court wishes to instruct on this aspect of Count 6, we submit that using the language from Sand & Siffert -- and this is Instruction 47A-21 of the most recent amendment of November 2002 of Sand &

Siffert found at Page 47A-39. We would request that the sentence I read be added, and then the definition of "reckless disregard," which follows in sentence 2.

**MS. YASSER:** If I may?

**THE COURT:** Yes.

**MS. YASSER:** This particular instruction speaks to the knowing requirement, and knowingly -- conscious avoidance has always been a part of the knowingly instruction and, where appropriate, where it's developed over the course of trial, where a defendant may have turned a blind eye to facts, that that could be used to establish knowing participation or knowing about a certain element.

In this particular case, the evidence as it was adduced from the victim is that Defendant Fuertes was present on an occasion where she was beaten, after which time she continued to, as a result, participate in prostitution to the benefit of Defendant Fuertes and Defendant Ventura.

The Defendant Fuertes did not inflict the violence upon Ms. Dueñas, and that is not the Government's theory.

**THE COURT:** I understand your theory. I'll let you know the decision.

Government, how long will you be in opening?

**MS. YASSER:** Your Honor, collectively, we believe we'll take approximately two hours.

**THE COURT:** Any idea how much of that is going to be

A. I heard that, but that's something that that guy over there put in her head. That's something that they made her do when she came here. Did you see her when she was crying also? She felt guilty in her heart.

Q. Mr. Franco, or Mr. Ventura, here is the question: Did you ever strike Ms. Franco?

A. As any couple, I can tell you, we've argued.

**THE REPORTER**: I'm sorry. One more time. One more time.

**INTERPRETER GOLDSTEIN**: As any couple would, we've argued.

**THE WITNESS**: And I'm going to say this here in front of all of these people here. If these fingers have ever touched a woman to hit her, I'll cut them off. It's only a fag that would touch a woman.

**BY MR. RUTER**:

Q. You did not push her to the ground and injure her elbow; is that right?

A. Unless it was on the beach when we went to go swimming, when we were playing, but I never saw her with a scrape.

Q. Did you ever strike her with a belt somewhere and the belt hit her thigh somewhere?

A. Why would I have to hit her? She's not an animal that you would have to hit like that. She's a human.

Q. Did you ever strike her somewhere on her hand on a car

door?

A. I've never touched her.

Q. Okay.

A. Unless she hurt herself or fell down, but all the time that she was with me, I never saw her with any bruises. I've never in my life touched a woman. I had a woman that I had for ten years with two children. They have the pictures. She's very beautiful.

I like pretty women. I don't discriminate anyone, but I like pretty women. So, during those ten years, why didn't I exploit my wife? In the 17 years I've been living here in the United States, if I like to hit women, wouldn't I have charges from the police for having hit women? There is many -- there are many intelligent adults here.

**MR. RUTER:** If I could have a moment, Your Honor, please?

**THE COURT:** Yes.

**THE WITNESS:** I would like to see the pictures of my wife, the mother of my children, Yenis Ruiz, please, where she's pregnant and getting graduated.

(Witness speaking in Spanish.)

**THE COURT:** Madam Interpreter, please tell the witness there is no question pending. Therefore, he should not be speaking.

**MR. RUTER:** Thank you, Your Honor.

**THE WITNESS:** I'm sorry, Your Honor.

**MR. RUTER:** Can we approach, Your Honor?

**THE COURT:** Come up.

(Whereupon, the following discussion occurred at the bench.)

**MR. RUTER:** Your Honor, I ordinarily would not do this, but I'm wondering -- I'm asking for an advisory opinion. If I could ask Mr. Ventura if there is anything that I have neglected to ask him that he believes is relevant to his case, one might object to that kind of a question, but there is no question in my mind that, if I don't ask such a question, there will be questions raised in the future.

**THE COURT:** Oh, we're way past that point.

**MR. MONTEMARANO:** That ship has sailed and sunk.

**THE COURT:** We can see the burning embers of that ship from afar.

**MR. RUTER:** I think so, Your Honor.

**THE COURT:** The answer will be: No, you will not be able to place that question, calling for a speech on behalf of Mr. Ventura.

**MR. RUTER:** Thank you, Judge.

(Whereupon, the bench conference was concluded.)

**MR. RUTER:** Your Honor, that concludes my examination of Mr. Ventura. Thank you.

**THE COURT:** Cross?

**MR. CUNNINGHAM:** Yes, Your Honor. Thank you.

**CROSS-EXAMINATION**

**BY MR. CUNNINGHAM:**

Q. Mr. Ventura, I'm going to ask you questions that, for the most part, will require a short "yes" or "no" answer. Do you understand?

A. It depends what you ask me, sir. I will answer. If you try to invade me or try to find me guilty, I will stand up and sit there. That's --

**THE WITNESS:** (In English) No, no, no, no. No guilty. (Through Interpreter) No. I'm not guilty. If you try to find a way to confuse me to say "yes" or "no," then I will not answer.

**BY MR. CUNNINGHAM:**

Q. Well, let's go back to the question that I just asked you. Did you understand that my questions to you will largely require a "yes" or "no" answer?

That's one of them. Yes or no?

A. I'll answer yes.

Q. And, in fact, you actually understand me as I speak English, don't you, Mr. Ventura?

A. If you say so, I do understand.

Q. Oh, come on, Mr. Ventura. You've spoken English to investigators, to the man over here, whose credibility you've tried to impugn on numerous occasions. You've communicated

with the Judge. You've written in English, and you're sitting here telling me --

**MR. MONTEMARANO:** Objection.

Q. -- you don't understand?

**THE COURT:** Slowly, slowly, please.

**THE WITNESS:** Okay, sir --

**THE COURT:** Sustained.

**THE WITNESS:** -- I will answer right now.

**MR. CUNNINGHAM:** You don't have to answer that question.

**THE COURT:** The jury will disregard any comments about correspondence between the Defendant and the Judge. It has not place in your consideration, so ignore that.

**BY MR. CUNNINGHAM:**

Q. My point is, Mr. Ventura, you have plenty of time to think about your answer because you understand what I'm saying, and then it gets translated to you, right?

A. I understand.

Q. Now, for the most part, your testimony, when Mr. Ruter was asking you questions -- certainly the last part of your testimony suggested that Rebeca Dueñas testified the way she did because of the influence of the Government; is that right?

A. 100%. I swear for my children, that is right. And that gentleman, he deports Latinos for any reason, and he takes the children away from immigrant women to force them to testify.

On the 15th of November, that this gentleman arrested me, he told me that Social Services had my two children, but he -- this gentleman should know that Yenis Ruiz was an American citizen, so he wasn't able to extort her. I swear by my two children.

Q. Well, Mr. Ventura, you have -- at one point in time, you said you didn't know what you're charged with. In fact, you had the charges fully described to you, correct?

A. I'll repeat once again, sir. I was never able to prepare for this trial. I was never shown any evidence or the CDs or the photographs, because you didn't let my lawyer show me that.

**MR. CUNNINGHAM:** Your Honor, I'm going to ask that you instruct the witness to answer the question posed to him.

**THE COURT:** I'll try.

(Laughter.)

**THE COURT:** Please do that, sir.

**THE WITNESS:** I'm answering to the gentleman the way it is.

**BY MR. CUNNINGHAM:**

Q. No, Mr. Ventura, you're not. My question to you was: It's correct that you've been told what you're charged with; "yes" or "no"?

A. I'm telling you again, sir: I was never shown any evidence. These are the only papers I have about my charges,

so how am I going to respond?

No. I'm sorry. I'm lying. This is the only thing they gave me when I came here to trial. The gentleman -- the lawyer gave me this. So I can't answer what he wants me to answer "yes" or "no."

Q. So let's try this one, then. Yes or no: You have been present --

A. I can't answer. Sorry.

Q. Yes or no, Mr. Ventura: You have sat at the Defense table throughout the presence --

A. No, I don't know. I haven't seen it.

Q. Wait until I finish the question, Mr. Ventura.

Yes or no: You have sat in that chair through the presentation of the testimony of all the witnesses in this case against you? Yes or no?

A. Yes. I saw the witnesses that you paid for them to come here and testify against me and gave them residency. Yes, I saw them. I -- I saw the killers also that were paid to come here and testify against me.

Q. By the way, speaking of that, you know the other defendant that sat at the table with you throughout this trial, don't you?

A. I don't even know you. I don't remember anybody, sir. I don't care about anybody else's life.

Q. I didn't ask you that.

A. Why don't we talk about the day they arrested me.
Q. Why don't you answer my questions, Mr. Ventura.
A. I don't know anybody, sir.
Q. You don't know the Defendant who is with you at the Defense table, Kevin or Kerlin Fuentes?
A. Mr. Government, did you hear me? I don't know anybody. I don't care about anybody else's life.
Q. So let's go through --
A. I'm here to give my testimony to defend myself.
Q. Do you know Freddy Soriano?
A. I told you, sir: I don't care about anybody else's life. I don't know anyone.
Q. I didn't ask whether you care about them, Mr. Ventura.
A. I don't know anybody.
Q. You don't know anybody?
A. I don't know anybody.
Q. Are you going to answer any of my questions, Mr. Ventura?
A. I'm here, sir, to defend myself against the testimony of the people that you put here on this chair that you paid -- that you gave them residency to, the criminals and the killers.
Q. By the way, you have no evidence whatsoever that the Government gave money to anybody, do you, Mr. Ventura; yes or no?
A. I told you, I don't -- I am not interested in anything.

**BY MR. CUNNINGHAM:**

Q. And you know the man that testified, Hector Avila; yes?

A. No. The one that you asked me, he's not here on the list.

Q. Oh, you're only going to answer questions about people on a list, Mr. Ventura?

A. Sir, I'm here sitting here in order to defend myself of the testimony of the people that testified against me, because I saw them here.

Q. And my point is: You knew Hector Avila before he came in here and testified; yes?

**MR. RUTER:** Objection.

**THE COURT:** Overruled.

**THE WITNESS:** But I do remember that he said that you had negotiated with him in order to come and testify so he could get out of the prison where he is.

**BY MR. CUNNINGHAM:**

Q. Well, in fact, he's still in prison. You saw him in prison garb, right, Mr. Ventura; yes or no?

A. That's what I heard, but I'm in CDF, and he's in Annapolis, I think, right? It's difficult to see him, Mr. Cunningham.

Q. The problem, Mr. Ventura, is you actually understand my question in English, and you want to start answering it before the translator has had an opportunity to translate it, so why

don't you just wait until I'm done with the question and she's done translating.

You knew Hector Avila before he came into this courtroom and testified; did you not?

A. May I say something?

Q. You may say "yes" or "no."

A. No. I'm asking you permission so you don't get upset. Can I talk?

Q. No, you can answer my question "yes" or "no."

A. That's to talk, to answer. I don't know anybody, sir.

Q. Oh, so you don't know Freddy Soriano?

A. No, sir. I don't know anybody, and, if I know him, I don't care about anybody else's life.

Q. And you don't know Kerlin Fuentes or Kevin Fuertes, also known as Flaco?

**MR. MONTEMARANO:** Objection, Your Honor. Asked and answered.

**THE COURT:** Well, it was asked.

**THE WITNESS:** I do know you. I do know you, because you took me up there to the third floor with Mr. Bittner, handcuffed, and asked me questions that you want me to cooperate, but I don't know him.

**BY MR. CUNNINGHAM:**

Q. You don't know Defendant Flaco?

A. I know you.

**THE COURT:** Mr. Ventura, you've lost the question. Now, please wait until the question is put.

**BY MR. CUNNINGHAM:**

Q. And you had nothing whatsoever to do with operating brothels or being involved in prostitution?

(No Spanish interpretation given.)

A. No, sir. Haven't you seen my taxes?

Mr. Ruter, can you show my tax clips?

**THE COURT:** Thank you, Mr. Ventura.

**MR. CUNNINGHAM:** I have nothing further, Your Honor.

**MR. RUTER:** No redirect.

**THE COURT:** Thank you. You may step down, sir.

(Witness excused from the stand.)

**MR. MONTEMARANO:** For the record, Your Honor, there won't be any cross by Mr. Fuertes.

**THE COURT:** You're waiving?

**MR. MONTEMARANO:** Oh, yeah.

**MR. RUTER:** And Mr. Ventura would rest, Your Honor.

**THE COURT:** Thank you. I assume you're renewing, Mr. Ruter; is that correct?

**MR. RUTER:** I am, sir, yes.

**THE COURT:** Incorporating all previous arguments?

**MR. RUTER:** Please.

**THE COURT:** Same result.

**MR. RUTER:** Thank you.

**MR. MONTEMARANO:** Yes, Your Honor.

**THE COURT:** Okay.

Members of the jury, as you can tell, we're not going to get to closing arguments today. So the parties have told me that their closing arguments will take almost three hours. My instructions will take a bit over one hour, so we're talking about four hours.

I want you to confer among yourselves and tell me whether you want to start tomorrow morning with arguments and then instructions, or whether you want to have a semblance of a normal trial week, which would begin next Monday. Please confer among yourselves and tell me what your decision is.

Give me the husher, please.

(Jurors conferring.)

**THE COURT:** Belinda? Yes?

**JURORS:** Tomorrow.

**THE COURT:** Very good. Please be in place at about 9:25. We will get started at 9:30 with the Government's opening, which is their first argument. They go first because, as I said, they have the burden of proof. Then we will hear from the Defense, then a Government rebuttal, and then I will give you instructions on the law, and the case will be given to you for your decision.

Thank you. Please remember: Don't discuss the case among yourselves or with anyone else. Have good evenings, and

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Docket No. WDQ-10-0770 |
| | Volume IX |
| GERMAN de JESUS VENTURA and KEVIN GARCIA FUERTES, Defendants | |

Baltimore, Maryland
April 19, 2013
9:34 AM to 3:32 PM

**THE ABOVE-ENTITLED MATTER CONTINUED ON FOR JURY TRIAL**
**BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**

A P P E A R A N C E S

On behalf of the Government:

Michael Cunningham, Assistant U.S. Attorney
Rachel Yasser, Assistant U.S. Attorney

On behalf of Defendant German de Jesus Ventura:

Gerald Ruter, Esquire

On behalf of Defendant Kevin Garcia Fuertes:

Michael D. Montemarano, Esquire

A P P E A R A N C E S (CONT.)

Also present:

HSI Special Agent Edward Kelly
Victoria Kirchgessner, Spanish Interpreter
Marta Goldstein, Spanish Interpreter

Reported by:

Martin J. Giordano, RMR, CRR, FOCR
U.S. Courthouse, Room 5515
101 West Lombard Street
Baltimore, Maryland 21201
410-962-4504

**PROCEEDINGS OF APRIL 19, 2013**

**THE CLERK:** All rise. The United States District Court for the District of Maryland is now in session, The Honorable William D. Quarles, Jr. presiding.

**THE COURT:** Good morning. Please be seated.

Counsel, are you ready for the jury?

**MR. MONTEMARANO:** Two things, Your Honor, very briefly. Initially, we have been provided with a change to the verdict sheet this morning --

**THE COURT:** Yes.

**MR. MONTEMARANO:** -- by Ms. Kies.

**THE COURT:** Very good.

**MR. MONTEMARANO:** I want to make sure I'm pronouncing her name right. I'm a little sensitive about that. And I'd like to be heard on that at some point, on the one.

Secondly, for the record, in terms of scheduling, I'll be requesting a break before we begin my closing argument, which will be a couple hours from now.

**THE COURT:** To compose yourself?

**MR. MONTEMARANO:** Well, I'd like to make sure the jury is concentrating on me, and not their bladders.

**THE COURT:** Okay. Ready for the jury, folks?

**MR. RUTER:** Yes, Your Honor.

**MS. YASSER:** Yes, Your Honor.

Oh, Your Honor, am I permitted to move the easels?

**THE COURT:** You can, but we're trying to keep -- you can do it now, because the connection is not necessary. If the connection should become necessary, then I'll ask you to move it. Yes, you may use it.

**MS. YASSER:** Thank you, and let me know if I --

**THE COURT:** Yes.

(Jury enters.)

**THE COURT:** Good morning.

**JURORS:** Good morning.

**THE COURT:** Please be seated.

Members of the jury, we're entering the final phases of the trial. As I told you, this phase is the argument phase. This is where the lawyers get to tell you what they think the evidence has proved. So I will ask you to give them your full attention. The Government has promised to be no more than 90 minutes in its opening close, and, again, give the Government your full attention. I will watch the clock for you.

**MS. YASSER:** Thank you, Your Honor.

May it please the Court, ladies and gentlemen.

This is a case about two men who profited from the sale and exploitation of women, women already vulnerable because of their status and their position in this country, women who were from all over, and largely up and down the East

Coast, who were transported interstate by the Defendants to engage in commercial sexual activity -- prostitution, usually on dirty, mostly bare mattresses in the basements and back rooms of squalor apartments, dark blankets covering the windows so that no light could come in and the outside world was shielded from seeing what was going on, seeing this largely hidden criminal violation.

These women were expected to service upwards of 30 men a day, $30, 15 minutes, of which the women only kept half, deductions made from that for the bare necessities of things to protect themselves, like condoms, paper towels, rubbing alcohol. They were not permitted to leave, no fresh air, no lights, only themselves and these men, and no communication with the outside world. They did that for six to seven days in a row before they were shuttled, herded like cattle to the next location where it would begin again, and all to line the pockets of the men responsible for their exploitation, Defendants Kerlin or Kevin Esquivel Fuertes and Defendant German de Jesus Ventura.

And, with respect to Defendant Ventura, it wasn't enough to profit from this illegal sexual commerce. He wanted to own it. He wanted to control it. And you saw, as he demonstrated for you yesterday, what you already knew to be true from all the evidence you had already heard in this case, and that's this defendant's complete and utter disregard for

the rule of law, his complete and utter disregard for the value of human life, his unrelenting desire to control the people around him.

And you've learned over the course of this trial, these many weeks, that, in order to control the sex-trafficking trade in Annapolis, Mr. Ventura, along, in the early stages, with the help from Kerlin Esquivel Fuentes, set out on a campaign to intimidate and to eliminate the competition through threats of and actual use of physical violence -- a campaign that included intimidating anyone who was perceived to have gotten in their way, starting with El Pelon.

You heard from Carlos Campos during this trial. Mr. Campos, if you can recall, was the gentleman who owned the electronic repair shop in Annapolis. He testified that he knew El Pelon, the victim of the homicide, for about eight years before he was murdered, and Ventura, who he called Pancho, for five of those years. Carlos Campos testified that El Pelon was in the very same business as Ventura and Fuertes, the prostitution business, and that he saw Fuertes, who he called Flaco, distributing business cards in his neighborhood around the area where Ventura was running brothels at that time.

And Carlos Campos testified that, one day back in March or April of 2008, Ventura and Fuertes came to see him

about a car stereo, and, at that time, Ventura told him that he wanted his friend, Victor, El Pelon, out of Annapolis, out of his territory. And, to make sure that they knew that Campos would take them seriously, Mr. Fuertes took a black Beretta out of the trunk of the car, and Ventura showed it to Mr. Campos in the hopes, of course, that he would pass on their threat to Mr. -- to El Pelon, to Victor.

And you learned that, about five or six months after this interaction, after this threat, El Pelon was murdered execution style, in the back of the head, and the woman, the prostitute that he was transporting at the time, miraculously was able to survive. And you heard from a young woman named Rebeca Dueñas, who testified and who was under control of Mr. Ventura at the time that she saw Ventura and Fuertes that night celebrating the murder of El Pelon, Fuertes with a gun.

The victim's girlfriend -- El Pelon's girlfriend provided phone numbers to law enforcement. Those phone numbers were of people who were threatening El Pelon in the months leading up to his execution-style murder, numbers that were the same numbers that Mr. Campos provided for Pancho and Flaco, Ventura and Fuertes, the same men who had come to him to threaten Victor, and those numbers became a starting place for Detective Hartlove, the man assigned to investigate the murder of El Pelon.

And what that investigation revealed and what many

people testified over the course of this trial is that Ventura used the murder of El Pelon in order to control the sex trade in Annapolis. Employees like Carlos Ascencio, Maximilliano Zelaya Repalo heard Ventura accept responsibility and take credit for the murder of El Pelon, and the reason -- the reason Ventura was touting his violent achievements was because, even though El Pelon was now out of the way, there were still others who were infringing on his territory; two men in particular, Freddy Soriano and his employee, Hector Avila.

Former employees of Ventura like Carlos Ascencio, Maximilliano Repalo among them, testified that Ventura planned to kill the Dominican and his worker, Mr. Zelaya Repalo going as far as driving around with Ventura and a firearm looking for him. And you saw the threatening text message and picture message, and that's Exhibit 5c/7, and you heard the threatening phone calls that Ventura placed to Freddy Soriano and Hector Avila.

That's the picture of a semi-automatic, a magazine, and a Santa Muerte statue, angel of death, that Ventura wished upon Hector Avila and Freddy Soriano. That message and 19a/6, which was the one sent to Hector Avila, were sent from Ventura's phone number, a phone Ventura was arrested with in November of 2010. That's the 3124 number that you heard so much about during the trial. And of course you know that that

same statue was recovered in Ventura's house next to a window remarkably similar to the one that's depicted there.

And, ladies and gentlemen, these threats of violence weren't just threats. You heard that, on November 3rd of 2010, Hector Avila was, in fact, assaulted with a pistol grip shotgun by one of Ventura's employees, Ferman Martinez Hernandez. Who could forget him, right? He testified here, and he told you that he set out to assault Hector Avila because Ventura told him to. That's why he did that. And ultimately it was that assault, the escalating violence, that led law enforcement to step in and take down Ventura's sex-trafficking operation, an operation they had been investigating for some time, and that ultimately led to the indictment of, among others, the two men who sit before you today.

Ladies and gentlemen -- and what that investigation revealed is that Ventura and Fuertes didn't direct their violence only to other men that were involved in the sex trade. You learned what happened to law-abiding citizens, members of the community who opened their doors to women working for Ventura.

Do you remember the woman Sandra Flores -- she came in -- the hard-working Hispanic woman, the cleaning woman, who lived in [redacted], during the time period when Olivia Maldonado, the prostitute, was recovered

from the apartment downstairs? She testified that the police came to her and asked that she lend a place for Maldonado to stay that night, because Ms. Maldonado, who was from out of state, had nowhere to go.

Ms. Flores agreed, and Ms. Maldonado, likely scared that Ventura would think that it was her that called the police to that location on that day, asked to borrow Ms. Flores' phone. You saw the phone records. You saw Ms. Flores' phone records, so you can see who it was that Olivia Maldonado called -- Mr. Ventura at his 0903 number.

And, almost -- I think less than an hour later, you saw an incoming call from Ventura to Ms. Flores, and Ms. Flores testified that Ventura called and threatened her and her family. He threatened to kill her and her family. In the weeks that followed, Ms. Flores' family was literally terrorized. They had gasoline placed in front of their doorway, rocks and sticks thrown at their window, and the van of her husband's car was smashed out, and that's all for lending a hand to one of Ventura's women.

And it's no wonder that Olivia Maldonado was nervous that this man would think that she called the police, because you heard from Margarita Santiago exactly what he did when he suspected people of calling the police on him. Remember Margarita Santiago? She was arrested in September -- end of September of 2009 at [redacted]. She was with

Carlos Ascencio at the time. Well, she testified that, after that arrest, Ventura called her and threatened her. He threatened to kill her. He was on a mission to find the person responsible for calling the police.

You also heard that Ventura was easily angered when he saw his women working for local competition, women that he felt that he should control. Hector Avila testified -- remember, Hector Avila is the man who was assaulted on November 3rd, 2010, the competition, one of the competitors for Mr. Ventura, and he testified that he saw, on one occasion, working was a woman named Isabella, a prostitute from Brazil, and, when he got a call for service with Isabella, he went to pull out his car, but he was being blocked. So he got out of his car, and he saw the Defendant, Ventura, in his green Ford Expedition.

And, while Hector Avila couldn't hear everything that was said to Isabella that day, what he did hear was a threat. He threatened that she needed to get out of there, or something would happen to her, that he knew -- he suspected that she was the one that was working with Hector Avila, and Hector Avila testified that he observed Isabella after that, that she was visibly upset, that she was scared, and that she asked Hector Avila to take her home, which he did.

Finally, in order to maximize his profits, Ventura set out to coerce and to compel, through fraudulent means as

well as the use of force, a young woman named Rebeca Dueñas Franco, a woman who was trying to get out of the prostitution life. This man made her false promises, and Ms. Dueñas, being of limited education and limited means, believed him, and she went with him.

Not before long, Ventura was harboring her in dilapidated apartments for his own sexual purposes. He put her to work, keeping all of the proceeds for himself, and he used threats of violence, guns, and actual physical abuse to maintain control over her, and, for a period of time, Ventura did so with the knowledge of his defendant, Fuertes, the man who was at every location where Rebeca Dueñas Franco was being held.

Now, as a result of their conduct, Ventura and Fuertes have been charged in a multiple-count Superseding Indictment.

If I may, Your Honor?

**THE COURT:** Yes.

**MS. YASSER:** These are multiple counts related to the interstate transportation of women, conspiracy, as well as sex trafficking by force, fraud, and coercion, and I'm going to review these charges and their elements and the evidence that supports these charges and the elements in just a moment, but, before I do, I want to just take a moment to reintroduce myself to you.

My name is Rachel Yasser, and I, along with my colleague, Michael Cunningham, have both the privilege and the responsibility of representing the United States in connection with the charges against Mr. Ventura and Mr. Fuertes, and we, together with Special Agent Ed Kelly of HSI, want to thank you for the time that you've taken out of your personal lives to be here and to pay attention to this very serious matter.

The Court is going to instruct you at the end of the trial what elements support each and every one of the charges in the Superseding Indictment, and your job as jurors -- and then he'll instruct you on the law, and his instructions will control, but your job as jurors will be to listen to the law, and then apply the facts and the evidence as you heard them to the law as instructed to you by the Court.

I want to do that with you now, and I want to start with the discussion of Counts 1 and 2 together. Count 1 is conspiracy to entice, to travel, or to travel or to transport interstate for purposes of prostitution. Count 2 is the actual interstate transportation for purposes of prostitution.

Starting with Count 1, conspiracy, there are a few elements here -- three elements to the conspiracy charge. First, that two or more persons entered into at least one of the unlawful agreements charged; that is, either enticement to travel interstate or the interstate transportation for purposes of prostitution -- people came to an agreement,

implicitly or explicitly; two, that the Defendant knowingly and willfully joined the conspiracy; and, three, that one of the members of the conspiracy, either the Defendants or other co-conspirators, knowingly committed at least one overt act in furtherance of the conspiracy, they did something -- they put some plans in action to make it happen.

And there are several overt acts charged in the conspiracy. The Judge will read them all for you. I'm not going to do that now. All you have to do is agree that one act was made in furtherance of the conspiracy. So this is a fairly straightforward charge. You just have to ask yourselves: Did Fuertes and Ventura agree, either implicitly or explicitly, with each other or others involved in the conspiracy to participate in an illegal operation that included the transportation of women, the enticement of women to come into Maryland for purposes of prostitution?

Count 2 is the actual physical or arrangement to physically transport people in interstate commerce for purposes of prostitution. Elements are simple: The Defendants knowingly transported any individual in interstate commerce, and the Defendants transported this individual with the intent that they would engage in illegal sexual activity, here prostitution.

Ladies and gentlemen, the evidence on these two charges is fairly uncontroversial. It's why the Defense told

you in opening statements that there was no disputing that these two men were involved in prostitution, and you know now from all the evidence that you heard in this case what kind of prostitution that business was. That model, you learned, relied on the interstate transportation of women. These women came from all over, and they were on sort of a circuit, because the men, as you heard -- the customers -- wanted variety, and so the women would move interstate from one place to another.

So what the Defense essentially told you in opening statements and what I predict they'll tell you again is that the Defendants are not guilty of these two charges because they didn't force anyone to commit prostitution. Well, as you know from having just seen the elements of the these offenses, there is no such requirement for these charges. The bottom line is it's unlawful for people to conspire to and then to transport or offer people to travel in interstate commerce for purposes of prostitution. It's the actual conspiracy and then the actual enticement and transportation that are separately criminalized. The question of voluntariness is simply not relevant to these charges.

So let's talk a little bit about what is relevant. What is relevant with respect to Count 1 is whether the Defendants were members of the conspiracy related to interstate transportation and, in Count 2, whether the

Defendants did, in fact, transport or arrange for the transportation of some of these women for purposes of prostitution. The evidence that you've heard is overwhelming as to both of these two counts.

I apologize to those on the end who can't see, but you'll have these back with you in the jury room.

What you learned from multiple witnesses in this trial is that Defendant Ventura was operating several brothels in the Maryland area, as well as in Virginia -- I'm sorry -- the Annapolis area, Virginia, as well as Easton, and that, for a significant period of time, Mr. Fuertes was working with Mr. Ventura. He handed out business cards. He worked in the brothels, collecting money to give to Ventura. In addition to working in the Maryland brothels, two of which he was actually arrested in, he also worked in Virginia, you heard from a couple of witnesses -- work that, of course, required the interstate transportation of women as part of the circuit from Maryland to Virginia and back.

In addition to the witness testimony that these two men were engaged in interstate transportation and enticement, you can be certain of the existence of this conspiracy based on the physical evidence that was seized and that you saw over the course of this trial, evidence that literally shows the connections between these two people and their illegal enterprise, the brothels that they were operating.

Starting with the September 2008 arrest of Mr. Fuertes, you learned he was driving a Nissan Altima that day, and that, after he gave a false name and a false birth certificate, he was arrested, and his car was towed, and it was later searched, and inside that car were 500 or so prostitution business cards of which you've heard plenty about, Crown condoms, and a machete. And, if you recall the registration on that vehicle, it was in the name of Amparo de Jesus Gonzalez at [redacted], a brothel where Mr. Fuertes was, on another occasion, actually arrested.

Now, who is Amparo de Jesus Gonzalez? Who knows? Who cares? It might not even be a real person, but what's significant about this name is that it showed up throughout this trial, and it shows the connection between these two defendants.

Let's take a look at the business card that Mr. Fuertes was arrested with. That provides an address, [redacted], the same address on the Nissan registration, as well as a phone number. The subscriber to that number is Amparo de Jesus Gonzalez at [redacted], and also, on a prior occasion -- this is 36d -- a prior occasion, the address of [redacted], Ventura's residence, the same place he was arrested in and he admitted was his home.

The subscriber to the telephone number Fuertes gave when he was arrested, the 5015 number -- and this is 36b --

Dulce Maria Benites Ventura. And the number that Ventura was also arrested with has a phone subscribed to [redacted] [redacted], and this is 36h. That's 09 or a -- I'm sorry -- that 0903 number. And what you see from these records is that number was first subscribed to German Ventura at [redacted]. But, after the death of Pelon, even that number changed to Amparo de Jesus Gonzalez at [redacted]. These men are using the same aliases, the same addresses to conduct their affairs, the same address that's actually associated with a brothel in which Fuertes was arrested.

And you also saw the BG&E bills at that brothel, as well as others, in the name of Amparo de Jesus Gonzalez, first at the [redacted] location, and then again, on another instance months later, at the same location, all of which establishes the connections between these two defendants and their involvement in the same illegal enterprise.

Now, the next day after Mr. Fuertes was arrested in the Nissan Altima, you learn that [redacted], his residence, was searched, and you saw pictures of that residence. Just as an example.

(Photograph displayed.)

**MS. YASSER:** There was no question what was going on behind those doors. That's in the basement. There was another picture similar to that one.

Rebeca Dueñas was present, and she testified that

she was working for Ventura at the time, and that was Ventura's brothel, which Fuertes was responsible for running, and her testimony was supported by the physical evidence recovered there. Her belongings were in an upstairs room showing that she was living there; she wasn't just a temporary resident like the other prostitutes that were there. There was a huge bag of condoms recovered in Fuertes' room, Crown condoms that are manufactured out of this country and that are commonly used in the sex trade.

Pancho's name and number was recovered in a notebook there. You know whose number that is, because he was arrested with it some weeks later. That's German de Jesus Ventura at the top. You also heard that there was a house phone seized at [redacted] on that day, a phone that, when law enforcement was actually there, started calling in and asking for women. That's the phone they used to generate their business, and you can see -- and that was the 8198 number, I believe, or 8168 number. And so, when you look at that number for evidence of conspiracy, what you learn is that that house phone number at [redacted] -- this number had multiple contacts with Mr. Ventura as well as Fuertes, the two numbers these gentlemen had at the time. We know they had them because they were arrested with them. 315 contacts in a two-month period, 83 contacts in a five-day period.

And not only that, establishing their connection

between the brothel, the business of interstate transportation, you can also see the contacts between each other, between themselves, further evidence of people that are involved in a conspiracy, because, frankly, who speaks 919 times in four months? Who speaks 3,000 times over a period of a year? Men who are involved in business together. You know from the context, the evidence in this case, precisely what that business was -- the business of interstate transportation for purposes of prostitution.

About a year following Fuertes' arrest in his car and at [redacted] -- there was an interim arrest as well at [redacted] -- Mr. Ventura was arrested with evidence that further confirmed that he was the leader of this illicit business. He was arrested on September 24th of '09 with a large amount of cash and tally sheets -- tally sheets with the names [redacted] or [redacted], which is [redacted], you heard, and [redacted], which is the [redacted] operation. Who has that kind of cash and tally sheets with two locations but the leader and organizer of a business? And the names on those tally sheets of course correspond to locations that you know were searched and that were, in fact, brothels during the same time that Mr. Ventura was arrested. There is no question what was going on behind those closed doors and in those basement rooms.

And, with respect to the [redacted] location that was on Ventura's tally sheet, that was also a location where

Mr. Fuertes had been arrested just months prior. He was arrested there running that operation that belonged to Ventura, and we know that, after that arrest, which was in the March time frame of 2009, Fuertes was placed in deportation proceedings, and he eventually FTA'd for an appearance there -- failed to appear for an appearance there. We later learned where it was exactly that he was -- running one of Ventura's operations in Virginia, [redacted].

You heard testimony from Carlos Ascencio that he began -- Carlos Ascencio, who began working for Ventura about four months prior to his arrest in September of 2009, met Ventura at Alex's brothel. Do you recall that testimony? He testified that he was initially -- Carlos Ascencio was initially working for a man named Alex, a man who had a bad eye, and that Ventura came to that brothel -- Alex's brothel as a customer, and that he recruited Carlos Ascencio to work for him in Maryland, and Carlos Ascencio, who was on probation, decided that that was a good idea, to get a little bit further outside of Washington, D.C. where he was.

Carlos Ascencio, if you remember, also testified -- and this will be relevant later -- that Ventura would come to Alex's house looking for the most beautiful women to take as his own. Carlos Ascencio testified that, when he began working for Ventura, it was the same as it was in D.C., that these women came from out of state from New York -- I think he

said Boston and elsewhere -- and that, on at least on one occasion, Ventura directed him to pick up a woman from New York, from the bus station in D.C., and then transport her to Maryland. He, just like everyone else in this case, said that these women were rotated on a weekly basis from brothel to brothel and across state lines and back. That is simply how this business operated, and everyone knew it.

One of the places that Ventura rotated his women was this brothel at [redacted], the same brothel that Ventura was surveilled bringing a woman to later in August of 2010, and that, Carlos Ascencio -- what Carlos Ascencio told you is where he met a man named Pacha and Juano and who he identified in this courtroom as Defendant Fuertes.

Carlos Ascencio said that Fuertes was running that location, and that he would later see -- after he went with Ventura and this prostitute to Virginia, where he saw Fuertes, that he would later see Fuertes also in Maryland at the end of the week, when the week's work was done, bringing the cash back to Ventura and dropping off the women from the Virginia brothel back to the Maryland brothels.

That, ladies and gentlemen, constitutes specific instances of transportation that support Count 2 as to both Ventura and Fuertes.

The phone records you saw also corroborated this testimony with respect to Mr. Fuertes and his connections to

the Virginia brothel. You saw -- and this is 40f/1 on our association chart -- that this number, 4168, was saved under Ascencio's phone as Juano, the man he identified as Fuertes, and that same number was saved in Ventura's phone as Pacha, the other name for Mr. Fuertes that Ascencio identified; was also saved as Norfo, which is common; they save the names of the brothels as the names of the brothels. It was also saved as Flaco on other phones connected to this case, [redacted] -- at [redacted], Ventura's residence in November of 2010.

So all the connections establish that this particular phone number was Fuertes' number at the time, and what you see between that number and Mr. Ventura are, again, numerous connections evidencing their participation in a conspiracy.

So, in conclusion on these two counts, it's eyewitness testimony, the physical evidence that were seized and that you saw in this courtroom, as well as the phone records that establish the conspiracy between these two individuals to engage in interstate transportation for purposes of prostitution as well as the actual interstate transportation of women for purposes of prostitution.

Now, Counts 3, 4, and 5 in the Indictment are what we call substantive counts that involve Ventura and only Ventura and his enticement and transportation of women on specific dates that are certain in this investigation. These

are dates where we actually know, although it's not required under the law, but we actually do know the names and identities of the women that were being transported, either because they were caught on surveillance, or because they were actually arrested in one of Ventura's brothels.

I want to start with Count 3, enticement to travel interstate for transportation -- I'm sorry -- enticement to travel interstate for purposes of prostitution. And this count relates to Margarita Santiago, September 2009, who you heard from in the course of this trial, and the elements of this offense are as follows. The first is that the Defendant knowingly persuaded or induced or enticed or coerced an individual to travel in interstate commerce; that the individual did, in fact, travel; and that the Defendant acted with the intent that she engage in prostitution.

The foundation for this charge, as I indicated, is the testimony of Margarita Santiago, a woman who, at the young age of 16, was forced in her home country to engage in prostitution. She was sent here by the father of her children, who was essentially keeping them captive in her home country. They were living with her mother -- with his mother. She was forced to give all her earnings to her cousins -- his cousins who were in New Jersey, and, if she did not send money, she could not see her children.

So, in September of 2009, already engaged in

prostitution, she got Ventura's number from another woman, who was also so engaged, and she called him, and Ventura offered her work as a prostitute here in Maryland. He told her to come to D.C. on a bus where he would pick her up. She testified that, upon her arrival here in Maryland after traveling from New Jersey, she called Ventura, and he picked her up in D.C. and transported her to Maryland.

She worked for him for one week. She went back up to New Jersey for one day to deliver the money, and then came back per instructions, per agreement between her and Ventura that he would, again, offer her work for the following week. And you saw the phone records that corroborated her accounts. You saw the contacts between her and Mr. Ventura up through and including the day of her arrest on September 24th of 2009.

And Ms. Santiago testified that, when she came here to Maryland, she did, in fact, work in Ventura's brothels, as well as the brothel in Virginia. And she testified that, when she did so, she slept in the same room where she was meeting her customers. She was not permitted to go out, that the ones that cared for the brothel would bring her her food and her necessities. She testified that she was sometimes treated quite badly, and that, on one occasion, she was assaulted by one of the customers -- an assault that she didn't report because, as she described it, the customer would threaten to call the police if she said anything to anyone about what had

happened. In her mind, it was the same police who threatened Immigration -- deportation upon her, and threatened to take her children away. It's no wonder that these women don't report these crimes.

Margarita Santiago was arrested the third time she came to Maryland to work for Mr. Ventura. That was at [redacted]. That was with Carlos Ascencio and another woman, Helen, who came from D.C. You saw the pictures of [redacted]. There is no question what was going on there at that date and time, and there was no question that Margarita Santiago traveled from New Jersey to Maryland at Ventura's direction to engage in prostitution.

Her testimony was uncontested, and it's unequivocal. She would not have come here to Maryland on the occasion charged in the Indictment if she had not had work offered to her by Mr. Ventura. It doesn't matter that she was willing. It doesn't matter that she was engaged in prostitution. She only came to Maryland on that occasion -- I should say those three occasions for the purpose of engaging in prostitution, and that, ladies and gentlemen, makes the Defendant guilty on Count 3.

Counts 4 and 5 are, as I said, specific instances of transportation again. Count 4 relates to Bridgett Alcivar and the August 2nd, 2010 transportation of her from Maryland down to Norfolk or, more specifically I guess, Portsmouth, Virginia

at [redacted]. You saw Ms. Alcivar on the surveillance images, and you learned that this was on a Monday. After hearing all about how the operation worked, you know that Bridgett Alcivar is coming to meet Ventura on a Monday. You see Ventura get out of his car, help her with her bags, and then she goes into his car where surveillance tracks them going into Portsmouth, Virginia. ICE agents in Norfolk pick up the surveillance and watch these two individuals go into [redacted], a location that was confirmed by the consensual calls to be a brothel. Ms. Alcivar, we know, has a history of prostitution arrests, and we know -- we know without having to hear from her exactly what Ventura was transporting her to do on that day.

You also, by the way, saw on Ventura's phone the number that he had at the time, if you recall, the 3124 number. You could physically see the phone crossing state lines to take Ms. Alcivar down to Portsmouth, Virginia during the time period that surveillance was not being conducted on them.

Count 5, again, is the same substantive count with respect to Mr. Ventura only and his transport of a woman named Bonita Torres Moran. This was the woman who was -- law enforcement recovered with Mr. Ventura on the morning of his arrest, November 15th, 2010. This was a woman who had on her person a number for Mr. Ventura. You can see -- it might be

difficult to see, but, if you see, about halfway through this calendar that was in her possession, Oscar Norfo, and a number, the 3124 number that we know that Ventura was arrested with that very same day, and you saw the contacts between those two numbers on that day, a Monday, the day where women are being brought to the next location to start their workweek.

Ms. Bonita Torres Moran had a large amount of condoms on her person. Mr. Ventura had prostitution business cards as well as tally sheets on his person. Surveillance picked these two up in D.C., when Ms. Moran was already in the vehicle with Mr. Ventura, after watching Mr. Ventura go into D.C. They then pick him up again. She's in the car. He moves her across state lines on the way to [redacted], where he's arrested, and the items that I just described were seized from the vehicle.

You know exactly what Mr. Ventura was taking Ms. Moran to do that day -- to have sex with upwards of 30 men in a dark, dirty basement room, no sheets, coverings on the windows, making minimal amounts of money, with Mr. Ventura and his co-conspirators keeping the rest for themselves. And that transportation, ladies and gentlemen, makes the Defendant guilty as to Counts 4 and 5.

Count 6 relates to both defendants, and it's the sex trafficking by force, fraud, or coercion. You heard from a

young woman who, in addition to being trafficked interstate by Ventura and Fuertes, was also the victim of coerced and forced sex trafficking at the hands of Ventura, but also to the financial benefit of Mr. Fuertes, and that is a separate violation of law. It's Count 6.

In the course of the time that Ms. Dueñas was made to work for Ventura, you also learned that Ventura both possessed and used firearms in connection with her trafficking, and that, as to just Defendant Ventura, is Count 7. I'm going to review those elements with you now, starting first with Count 6.

Count 6 requires the Government to prove beyond a reasonable doubt first that the Defendants either knowingly recruited, enticed, harbored, transported, provided, or obtained a person by any means, or benefited financially from participation in a venture so engaged, and I see some of you writing, so I want to just remind you that you will have the written instructions with you back in the jury room.

Two, the Defendants knew that force, fraud, or coercion would be used with respect to this person; three, that the Defendants knew that this person would be engaged in a commercial sex act -- prostitution, exchange of money for sex; and that the Defendants' conduct was in or affecting interstate commerce, as simple as the movement across state lines, the use of telephones, the use of condoms that are

manufactured out of the state.

And I submit to you that, with respect to Elements 1, 3, and 4, it's largely uncontested with respect to Ms. Dueñas. The real question has to do with Element 2, whether Defendants knew or had reason to know that force, fraud, or coercion would be used with respect to Ms. Dueñas.

With respect to Count 7 -- and, again, this is just the Defendant Ventura on Count 7 -- he's been charged with possession of a firearm in connection with a crime of violence, which is the sex trafficking of Ms. Dueñas. Count 7 requires the Government to prove beyond a reasonable doubt, first, the Defendant committed a crime of violence, which is Count 6, that he did, in fact, sex traffic by force, fraud, or coercion Ms. Dueñas, and that the Defendant knowingly possessed or -- a firearm in furtherance or used or carried a firearm in or in relation to that particular crime.

The victim of these counts, Rebeca Dueñas, was just 19 years old when she came into this country. She came from a small town in Guatemala named -- called Retantelco, where she was removed by her parents from school at the age of eight or nine years old, in third grade, so that she could help them farm. This is a young woman who came to Maryland knowing only one person, knowing of only one person in the United States, a woman that you heard about called Anna, and I say "knowing of," because I think you also learned that this was somebody

who her mother's friend had gotten a number for, that Ms. Dueñas had never met this particular woman before she came into the United States.

And, when Ms. Dueñas arrived in the United States, she had no family, no friends, no education, no English skills, and no money. She was illegally present in the United States, and she was pregnant with a child that resulted from a rape by a coyote during her transport here, an all-too-common occurrence.

Ms. Dueñas came into this public courtroom. She testified in front of a group of people who she had never met before, and she testified about things, I submit, that were extremely painful for her to relive. She talked about abuses that she had suffered both before and after she met the Defendants.

**DEFENDANT VENTURA:** Excuse me. Can you --

**INTERPRETER BLUMBERG:** Excuse us one moment. The battery ran out. Apologize.

Thank you, Ms. Yasser.

**MS. YASSER:** Remember how I mentioned control?

**MR. RUTER:** Objection.

**THE COURT:** Overruled. This is argument.

**MS. YASSER:** It was clear that Ms. Dueñas was very, very visibly upset, that she was -- felt some amount of shame and embarrassment at the three years of prostitution for which

she was engaged. She was terrified at confronting the men who were responsible for trafficking her, and that came across in her testimony. She testified in front of you for over six hours, over four of which she was subjected to cross-examination by incredibly experienced defense counsel.

Can you imagine the toll that that takes upon a person? And Ms. Dueñas, though at times she did have to compose herself and take a sip of water before she could answer a question, I submit to you that she answered the questions that were posed to her by the Government precisely the same way that she answered the questions that were posed to her by the Defense. She was direct, she was not defensive, she was not combative, and she was not evasive -- complete and utter contrast to what this defendant did when he testified here yesterday -- testimony that was so incredibly absurd that I submit that you can just dismiss it outright.

Now, with few exceptions, exceptions I submit were more result of confusion or lack of education, Ms. Dueñas' testimony did not waver. She was credible, and her account was corroborated at every single turn. Starting first, her testimony about what she did for a relatively brief period of time in the United States when she got here. She talked about her job at the recycling plant, and we saw a photograph of Ms. Dueñas working at the recycling plant.

Not before long, she met a man named Alex, a man

with a bad eye, a man who she met in a restaurant. You heard about Alex from other independent witnesses in this case. You heard about him from Carlos Ascencio, the same man with a bad eye who was involved in prostitution. You also heard about him from Special Agent Kelly, who confirmed that a brothel was searched in a location in D.C. that was attributable to Alex. It's a real guy.

With respect to Ms. Dueñas, Alex at first was nice to her. He took her out to dinner. He arranged for his aunt to help care for his daughter. He groomed her. That's what that is. He softened her, and then he used her daughter against her to get her to work in prostitution. You've heard that before. That happens in these cases. It's the same as what happened to Margarita Santiago. Suck them in. They use people they love against them, and they compel them to engage in prostitution -- work that you know, as Margarita Santiago testified, and has Rebeca Dueñas told the police back in September of 2008, work that no woman wants to do -- no woman.

Sometime later, Ms. Dueñas met Ventura. She testified that Ventura was a customer in Alex's house, that he was nice to her, that she told him that she wanted out of this life, and that he offered to help her. He offered to take care of her and her daughter. He promised her a better life, one without the defacement of prostitution, and that too was corroborated by an independent witness in this case, Carlos

Ascencio, who, before he worked for Ventura, worked for Alex, and he testified that Ventura actually recruited him from Alex's brothel and that Ventura would go there, and he would look for the most beautiful women, the women who would bring in the most amount of money, and he would go there to take them as his own. And that's exactly what he did with Ms. Dueñas. He went there, he saw she was young, she was pretty, petite, and he knew that she would bring him a lot of money.

Rather than using her as a regular prostitute, he had a plan to lure her in, to build her trust, to make her dependent on him for everything -- transportation, food, care of her daughter, shelter -- and then, when he had her under his control, he could direct her actions, keeping all the money that she was made to earn for himself, and that, ladies and gentlemen -- those false promises, those misrepresentations to start is enough to support Count 6 as to Mr. Ventura. You'll hear from the Judge that fraud as defined under that statute is simply defined as a misstatement or omission of a material fact to entice someone to engage in prostitution.

But there is a lot more than just fraud. After Ventura weakened her even more than she already was, he threw her a box of condoms -- chocolates, I think she called them -- and told her it was time to get to work. And, when she

resisted, she was beaten. Some of those beatings left marks on her body. RDF testified -- Rebeca Dueñas Franco testified that, on one occasion after being moved from [redacted], sometime following the police encounter there, she was moved to [redacted], which was a location outside -- just outside Baltimore City, a location that was owned, as you heard from Mr. Kim, the Korean owner at that location. By Ventura, she's moved there, and she was whipped with a belt when she refused to have sex with Black men.

Now, it's safe to assume, based on the testimony of others that you heard over the course of this trial, that the Hispanic brothel model was such that the women had never been asked -- that Ms. Dueñas had never been asked before to perform commercial sex acts with men outside her own community, and she told you that she refused to do so, something that's not easy to admit. She admitted it.

And what happened to her in response was that she was whipped with a belt, a beating that Defendant Fuertes was present for, and she testified that, after this beating and as a result of it, she did engage in the commercial sex that she was directed to do, sexual acts for which the proceeds were then shared between Defendant Ventura and Defendant Fuertes, and that incident, again, alone supports the finding of guilty as to both Defendants on Count 6 -- Ventura because he was the one who actually used the force to compel the prostitution

acts, and as to Mr. Fuertes because he benefited financially with the knowledge that such abuse was done.

Let me just say one thing about Fuertes before we move on to Count 7. This is a man who was present at every single brothel where Ms. Dueñas is recovered over the course of this investigation. He's there in 2008. He's there again in March of 2009. He's at [redacted] with Ms. Dueñas in April of 2009. So, even without the testimony about this particular physical assault, I submit that this is a man that had to have known what was going on. He had to have known. And, if he didn't know, he simply turned a blind eye to it.

And that, ladies and gentlemen, the Judge will tell you, makes him just as guilty in the eyes of the law. And don't forget either that this is the man who helped Mr. Ventura, who helped him with his dirty business, helped him threaten El Pelon. He had a gun. This wasn't a man who was going to object to mistreatment of women. He wasn't going to stop it, especially when it inured to his financial benefit.

There is some level of forensic corroboration to Ms. Dueñas' account as well. You recall that the injury from the belt to, I believe, her left thigh, as well as two others that she testified Ventura was responsible for -- an injury to her elbow where she was pushed down on rocks, as well as an injury to her left -- lower left leg by her ankle where she

said she was sliced by Mr. Ventura, those were noted by a doctor in this case, as she testified as an expert with respect to cutaneous or skin findings, and Dr. Baker actually -- she independently noted four significant injuries to Ms. Dueñas, which she took down in her report, one of which Ms. Dueñas, you know, doesn't attribute to the Defendant but was a significant physical mark on her body caused by the car door.

Dr. Baker saw, for example, the injury to Rebeca's right thigh -- left -- I can't remember, but I believe left thigh -- that was consistent with the tip of a belt. She made note of the injury to the elbow, which was precisely -- remember that star-like injury on the elbow? What did she call that -- that was consistent with being pushed down upon rocks. And she also felt and saw a scar -- a significant scar to Ms. Dueñas' ankle that was consistent with being cut with a knife. She knew that because of the shape and the size and its location, a location that was not consistent with self-infliction of wounds, a finding that serves to further corroborate Ms. Dueñas' testimony that Ventura sliced her ankle for refusing to perform what she thought was a distasteful sexual act with an inanimate object.

Ladies and gentlemen, it's not only the abuse, the Judge will tell you, that the Defendant inflicted upon Ms. Dueñas directly that matters in assessing the legitimacy

of her fear of Mr. Ventura and the reasonable belief of hers that Ventura's threats of harm to her were real, but it's also her observations of beatings and threats and acts of violence that she witnessed against others, all of which served to combine to create a general climate of fear around Ms. Dueñas.

For example, the time she witnessed Ventura beating a woman named Cassandra, a prostitute who had worked for Ventura and was suspected by Ventura of having called the police to rob one of his brothels. That also, by the way, was in the presence of Fuertes, who did nothing to stop it. The time Ventura hit Colmillo, a male worker of his, that you heard a little bit about throughout the trial. Let me show you Colmillo. And the bottom row of this chart are the men that were arrested in Mr. Ventura's brothels. This is Reyes, Colmillo.

And all the threats that she overheard being made to competitor pimps. And then, finally, her very reasonable belief that Ventura and Fuertes, based on her observations back in September of 2008, were, in fact, responsible for the murder of El Pelon. All of that is in Ms. Dueñas' head, and all of it is relevant to assessing the reasonableness of her fears.

Then of course, leading into Count 7, there are the guns that Ms. Dueñas saw Ventura with and Fuertes with on several occasions. Ms. Dueñas, of course, was one of five

people who came into this courtroom and testified under oath that they observed Ventura with guns on various occasions: Carlos Campos, Carlos Ascencio, Maximilliano Repalo, and Ferman Martinez Hernandez. And of course he had guns. Mr. Ventura was the owner and operator of at least six or seven brothels in the Maryland and Virginia area, a business where many other men were involved in robberies, assaults. They would call the police on one another.

You heard from the telephone calls -- the recorded calls that he was involved in -- constantly involved in sort of turf wars with these other men that were involved in sex trafficking. It's common sense that Ventura would have guns in his operation, and simply because law enforcement recovered only one of those guns as well as various machetes says nothing about whether those guns existed on prior occasions. Criminals get rid of their guns all the time. It's what they do.

With respect to Ms. Dueñas, she testified that she saw Ventura with guns on multiple occasions, but two different guns that she remembered. One was a black automatic, consistent with the same gun that Carlos Campos had seen, and one was a silver gun with some cream color on it as well, or maybe the cream was on the other one, and that she saw -- she couldn't recall when the last time she saw that gun was, whether it was before she was arrested or -- I'm sorry --

before Ventura was arrested in November of 2010, but what she did remember is that, on several occasions, Ventura would use the gun against her, that he even, on one occasion, held it to her head, and, though he said that he was just joking, just playing around, that it made her feel afraid, that she was scared of Mr. Ventura, and, because Ventura's possession and use of these firearms helped to keep her subdued, helped to maintain her fear, he is guilty as to Count 7 for using and possessing them in connection with sex trafficking.

In light of all these surrounding circumstances and in consideration of Ms. Dueñas' particular station in life, her education, her lack of English skills, her physical and mental condition, all of which the Judge will tell you is relevant and appropriate to consider, all of this in conjunction with the acts done by Mr. Ventura and Mr. Fuertes allow you to find that Ms. Dueñas reasonably believed that she didn't have a choice but to continue performing commercial sex acts as directed by Ventura, and, to be sure that Ms. Dueñas felt that she had no reasonable choice but to continue engaging in these acts, all you have to do is ask yourself: What pregnant woman chooses -- chooses, according to Mr. Ventura -- to engage in prostitution?

Do you recall her testimony that Ms. Dueñas, when she became pregnant with Mr. Ventura's child, was hopeful that this would be the time when he would allow her to stop, but

that he did not let her stop, that she was, in fact, injured as a result of seeing clients while pregnant, and you saw the surveillance images from that trip to the hospital, and you saw the hospital bill that was recovered in Ms. Dueñas' house. I shouldn't say "house." It was a room -- a basement room.

And you can literally see the misery on that woman's face. You can see the vacancy and the emptiness there. And, remember, she testified that, despite being pregnant and despite this injury, she was made to keep working in prostitution up to the day that Mr. Ventura was arrested in November of 2010, the end of the investigation.

Ms. Dueñas was five or six months pregnant at the time. You know that because of when her son was born in March of the following year, and you know that Special Agent Kelly identified in Ms. Dueñas' -- not Ms. Dueñas' messages, but, rather, the Defendant's messages, text exchanges between her and the Defendant that indicated that Ms. -- what this is, ladies and gentlemen -- this is a text sent by Ms. Dueñas to Mr. Ventura that confirmed that she was indeed pregnant at the time and working at the time, if you look at the following three messages showing her texting of addresses related to prostitution, related to brothels. The first message was sent on November 6th, 2010, and she sends a text at 1:35 a.m. The 1:35 a.m. text, which is 39b/2, Mr. Cunningham.

She sends a text at 1:35 a.m. telling Mr. Ventura

that the baby is moving a lot -- a desperate, albeit failed, plea to him to let him know that she doesn't want to work, but the next text reveals that her appeal didn't work. She's still working, and that text is a address that she texted to Ventura, consistent with her testimony that she had to text him when she arrived at a new brothel or arrived at a location where she was being a prostitute.

And, from a review of those recovered texts, you also saw a text that I submit suggests this woman's complete submissiveness to Mr. Ventura -- submissiveness in her voice before she's encountered by law enforcement, and, at this point in time, ladies and gentlemen, she's over two years in. She's completely resigned to Ventura's demands. You saw where he had her living. It was a small basement room, no food, no real money, no means of transport, dependent on this man for everything, exactly as he had initially planned.

Ladies and gentlemen, at the end of the day, this is a case about two men who exploited, who made their living off the sale and exploitation of women's bodies, of human beings -- human beings who were easily exploitable because of their desperate circumstances, people who are mistreated in the most extreme, in the most debasing, in the most degrading of ways. It's a case of two men who used violence and threats of violence in order to maximize their profits and to maintain control of a business. They used it in order to scare off the

competition. They used it to frighten law-abiding members of the community, to keep them quiet, and they used it to ensure for their sole use the earnings of Rebeca Dueñas.

Ladies and gentlemen, you have heard all the facts and all the evidence that you need to support the charges in the Indictment beyond a reasonable doubt, and justice is nothing more than the dispassionate application of the law to the facts. You are ready to do that now. The Defendants deserve no more than that, and the people of Maryland and the victims in this case deserve no less, and, when you return from that jury room after applying the law, as you'll hear it from the Judge, to the evidence in this case, you should emerge with guilty verdicts on all counts as to all defendants.

Thank you very much for your time.

**THE COURT:** Thank you.

**MR. MONTEMARANO:** May we approach, Your Honor?

**THE COURT:** Yes. Come up.

(Whereupon, the following discussion occurred at the bench.)

**MR. MONTEMARANO:** I need a bathroom break, Your Honor, if Your Honor is not inclined to break. I need a bathroom break --

**THE COURT:** Now and before your argument?

**MR. MONTEMARANO:** It's a medication issue, Your

don't quite fly for you.

It's good that we do this today on April 19th. It's a very important day for all of us. Two hundred thirty-eight years ago, some brave men faced the power of one of the most important and powerful countries on the face of this earth -- militiamen, defending their homes and their families on the Green at Lexington. This is the real patriot state, ladies and gentlemen.

What they give to us is for you to protect. I know you take your oath seriously. I know you think very hard about what you're doing. I know that you are sickened as much as anybody in this courtroom at what has happened over the last few years in and around Annapolis. But, if you make your decisions based upon reason and careful consideration and thought, you have to return verdicts of not guilty regarding Kevin Fuertes.

Thank you.

**THE COURT:** Mr. Cunningham?

**MR. CUNNINGHAM:** Thank you, Your Honor.

Good afternoon, ladies and gentlemen, and I can assure you that I will spare you a repeat of a lot of the testimony you heard. Certainly Ms. Yasser eloquently and comprehensibly evaluated the evidence that the Government is confident that, as you analyze it and assess it, you will do exactly as the Defendants requested that you do, and that is

to objectively analyze it, conclude what the facts are, and apply the facts to the law. We are equally confident that your verdicts will, unlike what they suggest they should be, be that the Defendants are guilty as charged.

Now, I'm sure, when you reported for jury duty two weeks ago, you didn't expect to learn with such detail the practice of the sex-trafficking trade, especially within the Hispanic community. However, I do think -- and notwithstanding the spin that perhaps Mr. Ventura might try to put on it -- that everyone agrees that this is a rather sordid, seamy, ugly environment, and the notion, any suggestion that the women who worked in this trade did so because of something other than the desperation forced upon them by dire financial circumstances, by an upbringing in a poor environment where they didn't get the education, where they didn't get the life skills and the opportunities that are afforded to many of us growing up -- not all, but many of us -- growing up in the United States, left them with options that were far fewer than most of us have enjoyed in life.

And it's within that *milieu* that the decisions that they make, however difficult for us to understand and embrace, have to be assessed. It's within that *milieu* that you have to consider the young woman who does, in fact, become subjected to the control, the exploitation, the manipulation, the physical and emotional violence of German Ventura.

German Ventura's desire to control was shown in a number of ways. As Ms. Yasser began during her opening statement, not only did he engage in the sex trafficking business, but there was a sector that he wanted to control, at least within the Annapolis community. Perhaps he fancied himself as another Raudel or Alex, carve out my area of influence, and that's where I'm going to assert control.

Now, it's kind of surprising. You didn't hear much of it in terms of counsel embracing or sponsoring the Defendant -- I mean Defendant Ventura's loathsomeness and loathsome regard for the Government, for law enforcement, and particularly for Special Agent Kelly, and I hope you would acknowledge, as the Government suggested in one comment to the Court, that it's -- not only is it utterly reprehensible and audacious to make such an allegation; it just flies in the face of a man who has, the evidence is, spent a commendable, long years of service to the United States providing the same kind of defense of our rights, freedom, and liberty as Mr. Montemarano suggested was done by the security officer at MIT.

So I appreciate that neither Mr. Ruter nor Mr. Montemarano embraced or suggested that there was any merit whatsoever to those outrageous condemnations, but let me take that as a point of departure for one overarching proposition. It's a lot easier to stand here and talk to you. Of course

it's one-sided. We don't have the luxury of dialogue where you might get to ask me, Mr. Ruter, Ms. Yasser, or Mr. Montemarano questions and engage in a back and forth, but I can assure you that trying to elicit a response from Ventura yesterday was one of the most unimaginably challenging things I've ever done as a lawyer of standing longer than Mr. Montemarano, of all things.

It was that control that he wanted to exercise in this courtroom that was so palpably obvious. I would submit also that it was his prevarication, his attempt to manipulate, his unwillingness to respond to a question that should suggest to you that it was utterly without any credibility, and that you should virtually flush anything he said -- the denial about being involved in prostitution, the denial of knowing anyone, not even willing to acknowledge that he knew people who came -- the only person I think that he acknowledged that he knew was Rebeca Dueñas. Otherwise, it was this wholehearted denial.

What it tells you: Not only that you should disregard the denials, but that someone who is willing to go that far, willing to say those kinds of things, is doing it for a big reason, and that's because the truth incriminates him. The truth is what makes him guilty.

Now, let me try to address, in the time that I have, just a couple of the things that were mentioned by counsel,

and, with all due respect to Mr. Ruter, because, again, harkening back to yesterday, I think you can appreciate, as the Government does, the challenge of his responsibility, which he undertook with honor and dispatched as he was supposed to, as our Constitution requires him to do, and as the Defendant, who will probably never understand, enjoyed a right and a representation that our Constitution says he deserves, and he got it, but the Constitution doesn't say a guilty man gets acquitted.

There was a suggestion the Government introduced the idea of the death of El Pelon as some sort of red herring. Well, first of all, ladies and gentlemen, I would submit that, were you to be considering whether these men are guilty of the death of Pelon, that would certainly be something you could take back and consider. You wouldn't have to scrub it from the get-go, but this case was not about the murder of El Pelon. You should not speculate about what's going on outside this courtroom, this environment, and what your considerations are.

The death of El Pelon and Ventura's ownership of it was introduced for two reasons. First of all, we have an obligation to prove that these men are involved in the conspiracy to engage in the prostitution business, and I distinguish prostitution business from sex trafficking. The conspiracy count, as Mr. Montemarano acknowledged, doesn't

require the force, fraud, and coercion. It's just the sex traffic. Excuse me. It's just the prostitution angle of it.

But think about it. If you're making threats about murdering or killing or injuring the competition, if you're owning the death of a competitor, what's that tell you? You're involved in the business. That's part of what we had to prove. But, secondarily, and much more significantly for the purpose of considering Rebeca Dueñas --

**DEFENDANT VENTURA:** Why didn't you charge me for murder, then? Why did you charge me for prostitution, Mr. --

**THE COURT:** Mr. Ventura, please be quiet. Now, you've been well behaved so far. Please continue that.

**DEFENDANT VENTURA:** This man's been lying a lot.

**THE COURT:** Quiet, sir.

**MR. CUNNINGHAM:** Like I suggested, ladies and gentlemen, you shouldn't think about what happens outside this courtroom. Rebeca Dueñas, there is a lot of talk about Rebeca Dueñas, and it was in that context that the discussions about, the ownership about the El Pelon murder also factors in to the attitude, the emotions, the shackles -- the mental shackles -- not physical shackles, but the mental and emotional shackles by which she was constrained by that man, compelled, coerced --

**DEFENDANT VENTURA:** That's why she came and testified about me, because you gave her --

**THE COURT:** Mr. Ventura, if you continue, I will have you removed from the courtroom.

**DEFENDANT VENTURA:** Why is he working it like you want to kill me or something?

**THE COURT:** Mr. Ventura, if you continue, I will have you removed from the courtroom.

**MR. CUNNINGHAM:** I don't want Mr. Ventura to be killed. I just want you to do justice. If there was any suggestion -- any question at all as to the utter ridiculousness of certain things, it was, during testimony, Mr. Ventura called Maria Theresa Baker that lying doctor.

Now, Dr. Baker came in for a very limited purpose, and that was to provide her expert -- her expertise, training and experience to you for the single purpose of saying, "The observations I made were consistent with the account of Rebeca Dueñas." She didn't go farther to say, "This is how it happened." She didn't say who did it. It was for a limited purpose, and the Government didn't try to sponsor it for anything more than that, but the idea that it was bought and paid for is utterly ridiculous and, again, comes back to the notion that the desperation of a guilty man would -- it was palpably obvious during his testimony.

Now, with regard to Rebeca Dueñas, indeed she did acknowledge that there were differences in her account or the progression of her account to law enforcement over the course

of more than a year -- more than a year and a half of providing information, but, as Ms. Yasser pointed out, this was not an evasive person on the stand. It was someone certainly who was traumatized, and I invite you, as you evaluate her testimony, to think about the trauma in her life.

There is no doubt that she probably had difficulty figuring out with some specificity, when did this occur? Well, most of us enjoy landmarks in our life history that help us to set dates: good things, positive things; sometimes sad things -- the death of a family member; the birth of a child. You know, "Oh, I had a great vacation here." When you think about those kind of mnemonic devices, we, most of our lives, are filled with those kinds of helpful things, but think of what the life must be for a woman who, from week to week, travels from one strange place to another, spends five or six days in a shabby, seedy little residence where she sleeps on the same stained, sheetless mattress on a floor on which she's supposed to lay down with ten, fifteen, twenty strangers a day to debase herself by having sex for money, when at least half of the money goes to men like that.

It's no wonder that trying to figure out exactly when something happened in a life like that -- it's not like for us where I can say, "Oh, yes, I took my son off to some camp," or, "We took a wonderful family vacation," "Oh, I remember that Christmas." She didn't have those kinds of

landmarks. So don't hold her responsible for some failures.

But, secondarily, her tongue was tied up, was constrained by the man sitting over there, by the fear of that man. When he got out -- or, frankly, he wasn't even incarcerated, because he -- he wasn't arrested when she was first arrested. He didn't get arrested until November, and the fear of what he would do to her, this fear born of what he threatened to do to other people, what he claimed responsibility for doing to other people -- Cassandra, she saw him with another prostitute. She saw what he did to another prostitute when she thought or -- excuse me -- when he thought that prostitute was responsible for a robbery of one of his brothels.

And, if she was really going to come in here and fabricate completely, to really put it to both of these guys, don't you think it would have been a whole lot more condemning than it was? What did she say? One time, there was an account of him using violence because of her unwillingness to engage in a sex act -- one time.

Now, think about it. If she was really going to make this up and, since, after all, it's largely her word versus his -- well, actually, it's just her word. She would have said a whole lot more than that, but it only takes that one time. It was that one time. It was that environment. It was that climate of fear in which Defendant Fuentes

participated, and that's why he's absorbed.

Counsel are wise to concede the conspiracy. Mr. Ruter's wise to concede the counts which are so obvious from the evidence and testimony, but they don't want to concede the force, fraud, and coercion, because there is at least an opportunity here, if you challenge Rebeca Dueñas, to attack. Well, you must evaluate her testimony carefully, and I submit that, when you do, you'll conclude that that young woman came in here, promised to tell the truth, and, through the four hours-plus, did tell you the truth, and the evidence that she presented does indeed support Count 6 as to both Defendants.

I think I have a few minutes, and I just want to make sure there is nothing that I -- Mr. Ventura -- excuse me. Mr. Montemarano wanted to isolate Fuertes from this act by using those dates. The one thing Ms. Dueñas did say was this act of violence, the striking, occurred at the [redacted], we're able by virtue of Mr. Kim's testimony, however difficult it was, again, to elicit information across the language barrier there, to essentially isolate that time frame to after Fuertes' March '09 arrest, so we know he is still working with Ventura, and it's here in Maryland, and it was before he went to Virginia.

Now, this whole business about the assault on Hector Avila, talk about red herrings. I mean, Fuertes left

Maryland because he was under -- finally came to be under the auspices of ICE. Now, as a momentary aside, whatever else you might think about the Immigration policies of the United States, there is no doubt that we've got some problems. We have some problems in enforcement and what have you, but the fact of the matter is that that's independent of this case from the standpoint of the enforcement action, but Fuertes had come under the umbrella of ICE enforcement, and the easiest thing for him to do was to abscond, to leave the jurisdiction and make sure that his presence was relatively limited; maybe Sunday afternoons, come up from Virginia, return on Monday. We saw that traffic.

But here is a guy who is still involved. Look at the telephone information. You're going to have that frequency chart to take back with you and evaluate it.

I wish I was as eloquent and adept as my colleague in presenting all of the evidence to you, and I wouldn't take exception with one thing that she said, except for one tiny thing she said, and that was you're going to have the organizational chart to take back with you. Actually, we use that as a demonstrative aid. You won't have that organizational chart when you go back into your deliberations, but I'm going to show it to you once more.

This is the demonstrative chart that the Government prepared based on the anticipated testimony. And I say

"anticipated," because I showed you this during opening statement, and I told you that this is what the evidence was going to show you, was going to prove to you, and that is that German Ventura was the top dog, that he had a couple of lieutenants. Fuertes was one of them. How many times Fuertes was arrested? At least twice in brothels: Once over at -- once at [redacted], and once at [redacted].

And the other guy is El Colmillo. How many people talked about him? A number of people. Ventura operated these brothels. All the people here at the bottom, at various times, in various police operations, were arrested.

Ventura wanted to carve out that niche. That's the rough organization that he created, using the fear, the threats, the effort to control things that we saw part of in this courtroom. It's interesting Mr. Montemarano started his statement with the account -- sad account in Boston and then concluded with reference to Patriots Day. Actually, another small correction. Patriots Day is actually celebrated -- was -- in fact, the first Patriots Day was April 19th. It's always celebrated -- it's a State holiday in Massachusetts, always celebrated on the third Monday of the month of April, and, sadly, it was this Monday, April 15th, when we were sitting, that the tragic events occurred in that city during the marathon, and we are appropriately reminded of our responsibilities as citizens to operate within the law, to

function as a nation of laws, and we afford people in this country, citizens or not, constitutional rights to a fair trial by individuals like you, who will objectively, dispassionately consider the evidence and render verdicts.

Those are important rights, not just to the individuals who are sitting as defendants, but they're important rights to all of us. We're confident that, when you do that, you will also respect the rights of the citizenry, hold the Government to the standard we bear in every single criminal case tried in this country -- proof beyond a reasonable doubt. It's part of what makes it a great country. We have no doubt whatsoever that, when you do that, you'll help keep it a great country and a safer country, and convict these men of these crimes.

Good afternoon.

**THE COURT:** Thank you, Mr. Cunningham.

Members of the jury, we're going to take a shorter lunch break than usual. That's okay, because we're delivering your lunch to you, so it should work out.

We will resume at 2:00 p.m. with my instructions, and then the case will be given to you for your decision. As I said, the instructions should take around about an hour, so I would expect to give the case to you to begin your deliberations sometime around 3 o'clock or so.

We are in recess.

prostitution.

The law makes such conduct illegal.

In this case, each defendant is accused of having been a member of a conspiracy relating to transportation and enticement for interstate prostitution. A conspiracy is a kind of criminal partnership or a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.

The crime of conspiracy to violate a federal law is an independent offense. It is separate and distinct from the actual violation of any specific federal law, which the law refers to as substantive crimes.

Indeed, you may find a defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime which was the object of the conspiracy was not actually committed. Moreover, you may find a defendant guilty of conspiracy despite the fact that he himself was incapable of committing the substantive crime.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful. This is because collective criminal activity poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

In order to satisfy its burden of proof, the

Government must prove each of the following things beyond a reasonable doubt: First, that two or more persons entered into at least one of the unlawful agreements charged in the charging document; second, that the Defendant knowingly and willfully became a member of the conspiracy; and, third, that one member of the conspiracy knowingly committed at least one overt act in Maryland during the conspiracy to further some objective of the conspiracy.

The first thing the Government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the charging document.

In order for the Government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Also, you need not find that the alleged conspirator stated, in words or writing, what the scheme was -- its object or purpose -- or every precise detail of the scheme, or the means by which its object or purpose was to be accomplished. What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established

by direct proof. However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of the case and the conduct of the parties involved.

In a very real sense, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful act.

The second thing that the Government must prove beyond a reasonable doubt to establish the offense of conspiracy is that a defendant knowingly, willfully, and voluntarily became a member of the conspiracy.

If you are satisfied that the conspiracy charged in the charging document existed, you must next ask yourself who the members of that conspiracy were. In deciding whether a defendant was, in fact, a member of the conspiracy, you should consider whether the Defendant knowingly and willfully joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective as an associate or worker?

In that regard, it has been said that, in order for

a defendant to be deemed a participant in the conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of the scheme is not essential, if you find that a defendant had such an interest, it is a factor which you may properly consider in determining whether or not a defendant was a member of the conspiracy charged in the Indictment.

As I mentioned before, before a defendant can be found to have been a conspirator, you must first find that he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether a defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences which may be drawn from them.

A defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that, to become a member of the conspiracy, a defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, a defendant need not have been fully informed as to all of the details or the scope of the conspiracy in order to

justify an inference of knowledge on his part. Furthermore, the Defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the Defendant within the ambit of the conspiracy.

Thus, a defendant may be convicted of conspiracy without full knowledge of all of the conspiracy's details. If he joins the conspiracy with an understanding of the unlawful nature thereof, and willfully joins in the plan on at least one occasion, even though he may not have participated before, might not participate again, and played only a minor role.

I want to caution you, however, that a defendant's mere presence at the scene of an alleged crime does not by itself make him a member of the conspiracy. Also, mere association with one or more members of the conspiracy does not automatically make a defendant a member. A person may know or be friendly with a criminal without being a criminal himself. Mere similarity of conduct or the fact that they may

have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant without knowledge merely happened to further the purposes or objectives of the conspiracy does not make the Defendant a member. More is required under the law. What is necessary is that the Defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, a defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a willing and knowing participant in the unlawful agreement; that is to say, a conspirator.

Finally, the Indictment alleges that the conspiracy began in or about March 2008 and continued until in or about November of 2010. You need not find that the starting date of the conspiracy coincides with the starting date alleged in the Indictment in order to render a guilty verdict. Rather, you must find that the starting date of a conspiracy began anytime

in the window alleged in the Indictment.

The third thing which the Government must prove beyond a reasonable doubt to establish the offense of conspiracy is that at least one overt act was knowingly committed by at least one of the conspirators in the course of the conspiracy.

In order for the Government to satisfy this element, it is only required that the Government prove one of the overt acts charged in the Superseding Indictment.

Also, you need not·find that the Defendant under consideration committed the overt act. It is sufficient for the Government to show that one of the co-conspirators knowingly committed an overt act in furtherance of the conspiracy, since such an act becomes, in the eyes of the law, the act of all the members of the conspiracy.

The Government must prove beyond a reasonable doubt that at least one overt act was knowingly and willfully done, by at least one conspirator, in furtherance of some object or purpose of the unlawful agreement. In this regard, you must bear in mind that the overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme. You are therefore instructed that the over act does not have to be an act which, in and of itself,

is criminal or constitutes an objective of the conspiracy.

You will recall that I have admitted into evidence against the Defendants the acts and statements of other persons because the Government charges that these acts and statements were committed by persons who are also confederates or co-conspirators of the defendants on trial.

The reason for allowing this evidence to be received against a defendant has to do with the nature of the crime of conspiracy. A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy, which are done in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be acts of all the members, and all of the members are responsible for such acts, declarations, statements, and omissions.

If you find beyond a reasonable doubt that a defendant was a member of the conspiracy charged in the Indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to

have been members of that conspiracy may be considered against the Defendant. This is so even if the acts were done and the statements were made in the Defendant's absence and without his knowledge.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements were made during the existence and in furtherance of the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who did or said them.

Counts 2, 4, and 5 of the Indictment charge interstate transportation for prostitution.

In Count 2, both defendants are charged with that crime. Interstate transportation of an individual with the intent that that individual engage in prostitution or sexual activity for which someone could be charged with a criminal offense in violation of the law. This happened from in or about September 2008 through in or about March 2009 as charged.

Count 2 reads that the Grand Jury charges that the allegations stated in Paragraphs 1 and 2 and 4 through 20 of Count 1 -- in other words, that long description of the

conspiracy that I read before -- are incorporated by reference into this count.

From in or about September 2008 through in or about March 2009, in Maryland and elsewhere, the Defendants did knowingly and intentionally transport individuals in interstate and foreign commerce, with the intent that those individuals engage in prostitution and sexual activity for which any person could be charged with a criminal offense.

In Counts 4 and 5, Defendant Ventura alone is charged with the same crime, on or about August 2, 2010 and on or about November 15, 2010 respectively. Count 4 reads that the Grand Jury charged Defendant Ventura first with all of the allegations set forth in the first count that are incorporated by reference here.

The Grand Jury charged that, on August 2nd, 2010, Defendant Ventura did knowingly and intentionally transport individuals in interstate and foreign commerce with the intent that those individuals engage in prostitution and sexual activity for which any person can be charged with a criminal offense.

Count 5 of the Indictment charges that the allegations set forth in that long list of things I read before are incorporated by reference in the count, and, on or about November 15th, 2010, in Maryland and elsewhere, Defendant Ventura did knowingly and intentionally transport

individuals in interstate and foreign commerce with the intent that those individuals engage in prostitution and sexual activity for which any person can be charged with a criminal offense.

In order to prove a defendant guilty of this crime, the Government must prove each of the following things beyond a reasonable doubt: First, that the Defendant knowingly transported individuals in interstate commerce as alleged in the Indictment; second, that the Defendant transported said individuals with the intent that those individuals would engage in prostitution or illegal sexual activity.

I instruct you that prostitution means engaging in sexual activity on account of which anything of value is given to or received by any person. An unlawful sexual activity includes anything that would be a crime under Maryland law that forbids engaging in prostitution.

Counts 2, 4, and 5, interstate transportation for prostitution, the first element, as I said, is transport in interstate commerce.

The first thing that the Government must prove beyond a reasonable doubt in Counts 2, 4, and 5 is that a defendant knowingly transported an individual in interstate commerce.

"Interstate commerce" simply means movement between one state and another.

decide.

Medical science has not yet devised an instrument which can record what was in one's mind in the distant past. Rarely is direct proof available to establish the state of one's mind. This may be inferred by what one says or does -- his words, actions, and conduct -- as of the time of the occurrence of certain events.

The intent with which an act is done is often more clearly and conclusively shown by the act itself or by a series of acts than by words or explanations of the act uttered long after its occurrence. Accordingly, intent, willfulness and knowledge are usually established by surrounding facts and circumstances as of the time the acts in question occurred or the events took place, and the reasonable inferences to be drawn from them.

Count 3 charges enticing interstate travel for prostitution.

The Grand Jury charged that, first by incorporating all of the long list of things I read in the first count, that, in or about September 2009, in Maryland and elsewhere, Defendant Ventura did knowingly persuade, induce, entice, and coerce any individual to travel in interstate and foreign commerce to engage in prostitution and sexual activity for which any person can be charged with a criminal offense.

The Indictment charges a violation of the United

States law that forbids such activity.

In order to find the Defendant guilty of persuading or enticing or inducing or coercing an individual to travel for the purpose of prostitution or engaging in illegal sexual activity, the Government must prove each of the following things beyond a reasonable doubt:

First, that the Defendant knowingly persuaded or induced or enticed or coerced an individual to travel in interstate commerce as alleged in the Indictment. To "induce" can be defined as to lead or move by influence or persuasion, to prevail upon, or, alternatively, to stimulate the occurrence of, to cause.

The second thing that must be proven is that that individual traveled in interstate commerce.

Third, that the Defendant acted with the intent that that individual would engage in prostitution or illegal sexual activity.

Count 3, again, involving enticing interstate travel for prostitution, requires persuasion to travel in interstate commerce.

The first thing that the Government must prove beyond a reasonable doubt is that the Defendant knowingly persuaded or induced or enticed or coerced an individual to travel in interstate commerce as alleged in the Indictment. As I earlier instructed you, an act is done "knowingly" if

it's done voluntarily and intentionally, and, as I also instructed, "interstate commerce" is movement between one state and another.

The second thing that must be proven to prove enticement of interstate transportation for prostitution is travel in interstate commerce, as alleged in the Indictment.

The third thing which the Government must prove beyond a reasonable doubt is that the Defendant acted with the intent that the individual would engage in prostitution or illegal sexual activity.

As I earlier instructed you, "prostitution" is sexual activity on account of which anything of value was given to or received by any person. An "unlawful sexual activity" means, for example, engaging in prostitution in violation of the law of Maryland.

Count 6 of the charging document charges the Defendants with sex trafficking.

The Grand Jury, first of all, alleged and incorporated all of the long list of things I read in the first count, then charged that, from in or about September 2008 through in or about November 2010, in Maryland and elsewhere, the Defendants did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, and obtain by any means a person -- namely, "R.D.F." -- and, as you'll recall, this is Rebeca

Dueñas Franco -- and did benefit financially and by receiving anything of value from participation in the venture engaged in such acts, knowing that force, fraud, and coercion could be used to cause "R.D.F." to engage in a commercial sex act.

The Indictment charges violations of federal law.

In order to prove a defendant guilty of sex trafficking, the Government must prove each of the following things beyond a reasonable doubt: First, that the Defendant knowingly recruited or enticed or harbored or transported or provided or obtained Esmirna Rebeca Dueñas Franco by any means, or benefited, financially or by receiving anything of value, from participation in such venture; second, that the Defendant knew that force, fraud, or coercion would be used with respect to this person; third, that the Defendant knew that this person would be engaged in a commercial sexual act -- and I will define that term for you; and, fourth, that the Defendant's conduct was in or affecting interstate commerce.

The first thing that must be proven is recruiting, enticing, transporting, or harboring.

The first thing the Government must prove beyond a reasonable doubt is that the Defendant knowingly transported or recruited or enticed or harbored or provided or obtained Esmirna Rebeca Dueñas Franco, by any means, or benefited, financially or by receiving anything of value, from

participation in such a venture.

To "harbor" someone simply means to provide shelter to that person. As I said before, an act is done knowingly when it's done purposely and intentionally as opposed to mistakenly or inadvertently.

The second element of this offense which the Government must prove beyond a reasonable doubt is that the Defendant knew that force, fraud, or coercion would be used with respect to Esmirna Rebeca Dueñas Franco.

Fraud, as I just used that term, means that the Defendant knowingly made a misstatement or omission of a material fact to entice Ms. Franco. A material fact is one which would reasonably be expected to be of concern to a reasonable person in relying upon the representation or statement in making a decision.

Coercion, as I have used that term, means a threat of serious or physical restraint against a person. A threat is a serious statement expressing an intention to inflict harm, at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. A statement is a threat if it was made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to cause harm, or a reasonable person making the statement would foresee that the recipient would understand it as a serious

expression of intent to cause harm.

The term "serious harm" includes both physical and non-physical types of harm, including psychological, financial, or reputational harm. That is sufficient under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. In determining whether the Defendant made a threat of serious harm that could reasonably be believed by Ms. Franco, you should consider her particular station in life, physical and mental condition, age, education, training, experience, and intelligence. A threat of serious harm must be of a sufficient kind -- must of sufficient in kind or degree to completely overcome the will of an ordinary person having the same general station in life as that of Ms. Franco, causing a reasonable belief that there was no reasonable choice except to engage in the commercial sexual act as directed by the Defendant.

Coercion, as I have used the term, also means that the Defendant engaged in a course of behavior intended to cause Ms. Franco to believe that, if she did not engage in a commercial sex act, as directed by the Defendant, that she or, for example, her family would suffer serious harm.

To satisfy this element, the Government must prove that force, fraud, or coercion, as I have just defined those

terms, was used, and also that the Defendant knew it would be used against the victim.

As I first instructed you, the second element of sex trafficking by force, fraud, and coercion is that the Defendant knew that force, fraud, or coercion would be used with respect to Ms. Franco. If you find that a defendant transported or recruited or enticed or harbored or provided or obtained Ms. Franco by any means, or benefited, financially or by receiving anything of value, from participation in such a venture after December 23rd, 2008, you need not find that that defendant had actual knowledge that force, fraud, or coercion would be used against her. Instead, this element is satisfied if you find that the Government has proved beyond a reasonable doubt that the Defendant acted with reckless disregard of the facts concerning the use of coercion. The phrase "reckless disregard of the facts" means deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that Ms. Franco was coerced to engage in a commercial sex act.

The third thing which the Government must prove beyond a reasonable doubt is that the Defendant knew that Ms. Franco would be engaged in a commercial sex act.

A "commercial sex act" is any sex act on account of which anything of value is given to or received by any person.

The fourth thing which the Government must prove

beyond a reasonable doubt is that the Defendant's conduct was in or affecting interstate commerce.

Interstate commerce simply means the movement of goods, services, money, and individuals between any two or more states or between one state and the District of Columbia.

And that definition holds throughout the instructions about the District of Columbia is considered a state for purposes of interstate commerce.

Transporting a person across state lines for a commercial purpose is conduct "in interstate commerce." In addition, acts and transactions which are economic in nature and affect the flow of money in the stream of commerce to any degree, however minimal, also "affect" interstate commerce. For example, the use of hotels that service interstate travelers or the use of condoms that travel in interstate commerce is conduct that "affects" interstate commerce.

To satisfy this element, the Government must prove that the Defendant's conduct affected interstate commerce in any way, no matter how minimal. You do not have to find that Defendant's conduct actually affected interstate commerce if you find that the Defendant's conduct would have affected interstate commerce if the Defendant had successfully and fully completed his actions. Finally, the Government is not required to prove that the Defendant knew he was affecting interstate commerce.

Count 7 of the Indictment charges possession of a firearm in furtherance of a crime of violence. The count charges that on or -- in or about November 2010, Defendant Ventura did knowingly possess a firearm in furtherance of or used and carried a firearm during and in relation to a crime of violence; that is, sex trafficking.

The Grand Jury, of course, first realleged all of the statements that I made in Count 1 and incorporate it here, and further charged that, beginning at least in or about September 2008 through in or about November 2010, in the District of Maryland, Defendant Ventura did knowingly possess a firearm in furtherance of and used and carried a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, and, in so doing, did brandish a firearm in violation of federal law.

To satisfy its burden as to Count 7, the Government must prove each of the following things beyond a reasonable doubt: First, that the Defendant committed the crime of violence charged in Count 6 of the Indictment, which is a crime for which he might be prosecuted in a court of the United States; and, second, that the Defendant knowingly possessed a firearm in furtherance of or used and carried the firearm in relation to the crime charged in Count 6.

The first thing the Government must prove beyond a reasonable doubt is that the Defendant committed a crime of

violence for which he may be prosecuted in a court of the United States.

A crime of violence under this section includes the offense of sex trafficking. I've already instructed you that the offense of sex trafficking is a crime of violence.

If, during your deliberations, you determine that the Government has failed to prove beyond a reasonable doubt that the Defendant is guilty as to the crime of violence -- that is, sex trafficking -- as charged in Count 6, then you will proceed no further with Count 7.

In reaching your verdict, you are to consider evidence of the crime of violence only for the purpose of determining whether this first element has been satisfied.

The second thing the Government must prove beyond a reasonable doubt is that the Defendant knowingly possessed a firearm in furtherance of or knowingly used or carried a firearm during and in relation to the commission of a crime of violence.

To prove that the Defendant possessed the firearm in furtherance of the crime of violence, the Government must prove that the Defendant had possession of the firearm and that such possession was in furtherance of the crime. Possession also means that the Defendant either had physical possession of the firearm or on his person, or that he had dominion and control over the place where the firearm was

located and the intention to exercise control over the firearm. To possess a firearm in furtherance of the crime means that the firearm helped forward, advance, or promote the commission of the crime. The mere possession of the firearm at the scene of the crime is not sufficient under this definition. The firearm must have played some part in furthering the crime in order for this element to be satisfied.

You must also find that the Defendant possessed the firearm knowingly. This means that he possessed it purposely and voluntarily, and not by accident or mistake. It also means that he knew the weapon was a firearm as we commonly use the word. However, the Government is not required to prove that the Defendant knew that he was breaking the law.

A "firearm" is any weapon which will, or is designed to, or may be readily converted to expel a projectile by the action of an explosive.

In order to prove that the Defendant used the firearm, the Government must prove beyond a reasonable doubt an active employment of the firearm by the Defendant during and in relation to the commission of the crime of violence. This does not mean that the Defendant must actually fire or attempt to fire the weapon, although those would obviously constitute use of the weapon. Brandishing, displaying, or even referring to the weapon so that others present knew that

the Defendant had the firearm available, if needed, all constitute the use of the firearm. However, the mere possession of a firearm at or near the site of the crime without active employment, as I have just described it, is not sufficient to constitute the use of the firearm.

In order to prove that the Defendant carried the firearm, the Government must prove beyond a reasonable doubt that the Defendant had the weapon within his control in such a way that could further the commission of the crime of violence, or was an integral part of the commission of the crime. The Defendant did not necessarily have to hold the firearm physically; that is, have actual possession of it on his person. If you find that the Defendant had dominion and control over the place where the firearm was located and had the power and intention to exercise control over the firearm in such a way that it furthered the commission of the crime of violence, you may find that the Government has proven that the Defendant carried the weapon. If applicable: It is not sufficient to prove carrying if all the Government has proven is that the firearm was transported in a vehicle in which the Defendant was riding. There must be proof that the Defendant knew of the weapon's presence and had the power and intention to exercise control of the weapon so that it was available for his use in the commission of the crime if the need arose.

To satisfy this element, you must also find that the

Defendant carried or used the firearm knowingly. This means that he carried the firearm purposely and voluntarily, and not by accident or mistake. It also means that he knew the weapon was a firearm as we commonly use the word. However, the Government is not required that he knew that he was breaking the law.

In this case, you may find the Defendant guilty of possessing a firearm if you find beyond a reasonable doubt either, one, that he was a member of a conspiracy, and the crime of possessing a firearm was committed by others in furtherance of that conspiracy, or, two, that he aided or abetted the possession of a firearm.

The question of possible punishment of a defendant is of no concern to you, and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests entirely upon me. Your function is to weigh the evidence in the case and determine whether or not each defendant is guilty beyond a reasonable doubt, solely upon the basis of that evidence. Under your oath as jurors, you cannot allow a consideration of the punishment which may be imposed upon a defendant, if he is convicted, to influence your verdict in any way, or in any sense enter into your deliberations.

You will be pleased to know I've now reached the last part of these instructions, relating to the mechanics and

procedures for your deliberations.

When you retire to the jury room, you will select one of yourselves to act as your foreperson. The foreperson will preside over your deliberations and be your spokesperson here in court.

If it becomes necessary during your deliberations to communicate with me, you may send a note by the Bailiff, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing, and I will never communicate with the jury on any subject touching the merits of the case other than in writing or here orally in open court.

You will note from the oath about to be taken by the Bailiff that he and all other persons are forbidden to communicate in any way with any member of the jury on any subject touching the merits of the case. Now, the Bailiff can ask you if the room temperature is okay, if you have enough note pads or pens, that sort of thing, but he cannot ask you about or get involved in your deliberations at all.

Bear in mind also that you are never to reveal to any person -- that includes me -- how you stand numerically or otherwise until you've reached a unanimous verdict. I never need to know that there are so many of you for one position or so many of you for another. I cannot use that information.

Please do not communicate that information to me.

These verdict forms have been prepared for your convenience, and, as you will see, there is a form for each of the Defendants, and, as was noted, not all of the Defendants are in each count, but the verdict forms will show you which count each defendant is in, and you can use that as sort of a guide not only to your deliberations, but to the instructions themselves and which instructions pertain to each individual defendant.

You will take these forms to the jury room, and, when you have reached a unanimous verdict, you will have your foreperson fill the verdict forms in, and then date and sign them. When you have reached a unanimous verdict, please tell the Bailiff.

You will then be brought back into the courtroom, and the Clerk will take roll and then your verdict. She'll ask you if you have agreed upon your verdict, and, if you have, you'll say, "We have."

She will ask, "Who will speak for you?"

And you will reply, "Our foreperson."

The Clerk will then ask the foreperson for the verdict.

The verdict must represent the considered judgment of each of you. To return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without offense to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. During your deliberations, do not hesitate to reexamine your own views, and change your opinion, if you are convinced it is wrong. But do not surrender your honest conviction about the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times: You are not partisans, you are judges -- judges of the facts of this case.

Counsel, please approach.

(Whereupon, the following discussion occurred at the bench.)

**THE COURT:** There is a [redacted]. Okay.

**MR. MONTEMARANO:** Subject to the prior objections and whining put on the record by the Defense, I don't think there is any objections from the -- as to the instructions as read to the jury.

**THE COURT:** Thank you. And I consider all of your previous objections and statements fully restated here.

**MR. RUTER:** Please. Your Honor, thank you.

On Page 89 -- and this could be just my lack of

intellect -- I'm trying to figure out whether or not the last paragraph of Page 89, which is Count 7, is an active statement of the law given the fact that this particular possession must revert back to Count 6. Count 6, of course, has more of an element than just a conspiracy that deals with -- it deals with sex trafficking. It has nothing to do with conspiracy. It has to do with sex trafficking, force, coercion, and so on. So I'm just not clear --

**THE COURT:** What's your proposal?

**MR. RUTER:** That there be language, Your Honor --

**THE COURT:** What's your language?

**MR. RUTER:** I don't have my -- specifically at this time, Your Honor.

**THE COURT:** Propose language that you want me to consider.

**MR. CUNNINGHAM:** Well, Your Honor, coincidentally, we noted that we don't think that the first clause of that would be applicable in this case.

**THE COURT:** Okay. So it would be the -- the co-conspirator conduct?

**MR. MONTEMARANO:** Yes.

**MR. CUNNINGHAM:** Correct, Your Honor.

**THE COURT:** Okay. What about the aiding and abetting theory? You're actually charging him with actual, aren't you?

**MR. CUNNINGHAM:** We're charging with actual, so --

**THE COURT:** So we can just strike the last paragraph?

**MR. CUNNINGHAM:** Yes, Your Honor.

**THE COURT:** Okay. Belinda, may I have the mic back, please.

(Whereupon, the bench conference was concluded.)

**THE COURT:** Members of the jury, on Page 89 of the instructions, there is a last paragraph that talked about other theories for finding someone guilty of possessing a firearm in furtherance of a crime of violence.

By agreement, that last paragraph should not be considered by you. That's not the theory. The theory in this case is that the Defendant Ventura himself actually possessed the gun and used it in furtherance, or possessed it in furtherance of the crime. So, therefore, the other things about a co-conspirator possessing or about aiding and abetting possessing are not at issue here. The Government's theory is that Mr. Ventura himself personally possessed the weapon in furtherance of a crime.

So that will not be in the instructions that you receive, but, for those of you who have very good memories and remember what I read, I want you to know that that's not a part of your deliberations.

Thank you.

Bailiff.

**THE CLERK:** Raise your right hand.

(Oath administered.)

**THE CLERK:** Will you state your name for the record, please.

**CSO:** Dennis Hooper.

**THE CLERK:** Thank you, sir. All rise --

**THE COURT:** Wait a minute. Alternates Number 1, 2, and 3, I want to thank you very much for your service. You've been my insurance policy the past two weeks, and, as you see, we did actually need one of the alternates to fill in to the jury. However, the jury is intact, and we'll not be needing your services further.

Yes, sir?

**JUROR 12:** Can I come talk to you?

**THE COURT:** Okay. Come up.

Counsel?

(Whereupon, the following discussion occurred at the bench.)

**THE COURT:** Yes, Number 12?

**JUROR:** I really can't handle this, because I don't think my education is -- because I never did graduate, and I only went to the ninth grade, so I don't think I can handle this, and I don't think I'd be fair.

**THE COURT:** Well, we all chose you because we had

**MR. CUNNINGHAM:** We're charging with actual, so --

**THE COURT:** So we can just strike the last paragraph?

**MR. CUNNINGHAM:** Yes, Your Honor.

**THE COURT:** Okay. Belinda, may I have the mic back, please.

(Whereupon, the bench conference was concluded.)

**THE COURT:** Members of the jury, on Page 89 of the instructions, there is a last paragraph that talked about other theories for finding someone guilty of possessing a firearm in furtherance of a crime of violence.

By agreement, that last paragraph should not be considered by you. That's not the theory. The theory in this case is that the Defendant Ventura himself actually possessed the gun and used it in furtherance, or possessed it in furtherance of the crime. So, therefore, the other things about a co-conspirator possessing or about aiding and abetting possessing are not at issue here. The Government's theory is that Mr. Ventura himself personally possessed the weapon in furtherance of a crime.

So that will not be in the instructions that you receive, but, for those of you who have very good memories and remember what I read, I want you to know that that's not a part of your deliberations.

Thank you.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL No. WDQ-10-0770** |
| **GERMAN DE JESUS VENTURA,** | : | |
| **and** | : | |
| **KEVIN GARCIA FUERTES** | : | |
| | : | |
| **Defendants.** | : | |

**...ooOoo...**

**GOVERNMENT'S REQUESTED JURY INSTRUCTIONS**

The United States of America, by and through its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, and P. Michael Cunningham and Rachel Miller Yasser, Assistant United States Attorneys for the District of Maryland, respectfully requests the Court to instruct the jury in the above-captioned matter in accordance with the proposed instructions attached hereto, in addition to its usual instructions in a criminal case. The government asks that it be allowed to submit proposed supplemental instructions if they become appropriate in light of developments prior to or during trial. The government further requests that, pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Court inform counsel of its proposed instructions prior to argument to the jury.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

/ss/

By: ______________________________
P. Michael Cunningham
Rachel M. Yasser
Assistant United States Attorney

The government requests the following standard instructions from Sand & Siffert, *Modern Federal Jury Instructions*:

1. Instruction 1-12 – Jury to be Guided by Official English Translation/Interpretation
2. Instruction 2-1 – Juror Attentiveness
3. Instruction 2-2 – Role of the Court
4. Instruction 2-3 – Role of the Jury
5. Instruction 2-4 – Juror Obligations
6. Instruction 2-5 – The Government as a Party
7. Instruction 2-8 – Conduct of Counsel
8. Instruction 2-11 – Improper Considerations
9. Instruction 2-12 – Sympathy
10. Instruction 3-1 – Indictment is Not Evidence
11. Instruction 3-6 – Multiple Counts
12. Instruction 3-12 – Variance--Dates
13. Instruction 3A-1 – Knowingly
14. Instruction 4-1 – Presumption of Innocence and Burden of Proof
15. Instruction 4-4 – Specific Investigation Techniques Not Required
16. Instruction 5-2 – Direct and Circumstantial Evidence
17. Instruction 5-3 – Questions
18. Instruction 5-4 – Testimony, Exhibits, etc.
19. Instruction 5-5 – Judicial Notice (if applicable)
20. Instruction 5-6 – Stipulation of Facts (if applicable)

21. Instruction 5-8 – Deposition (As Substantive Evidence) (if applicable)
22. Instruction 5-9 Transcripts of Tape Recordings
23. Instruction 5-12- Charts and Summaries (admitted as evidence)
24. Instruction 5-19 – Admission of Defendant (if applicable)
25. Instruction 5-21 – Improper Consideration of Defendant Not Testifying (if applicable)
26. Instruction 5-22 – Silence as Admission (if applicable)
27. Instruction 6-1 – Inference Defined
28. Instruction 6-17 – Knowledge, Willfulness, Intent
29. Instruction 6-18 – Motive
30. Instruction 7-1 – Witness Credibility – General Instruction
31. Instruction 7-4 – Defendant's Interest if Defendant Testifies (if applicable)
32. Instruction 7-16 – Law Enforcement Witness
33. Instruction 7-19 – Impeachment by Prior Inconsistent Statement (if applicable)
34. Instruction 7-21– Expert Witness- Generally (if applicable)
35. Instruction 9-1 – Punishment
36. Instruction 9-3– Communication with the Court
37. Instruction 9-7– Duty to Consult and Need for Unanimity

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 38**
**(Introduction to the Charges)**

The instructions which I have just given to you are more or less of a general nature applicable to all criminal cases before this Court. Now I am going to give you specific instructions relevant to this particular case.

We will next consider the crimes with which the defendants are charged in the Superseding Indictment. The alleged crimes are charged in what is called a count. You must consider each count separately. The defendants have been charged in Count One with conspiracy to 1) knowingly transport an individual in interstate commerce with intent that such person engage in illegal sexual activity, in violation of 18 U.S.C. § 2421, or 2) knowingly persuade, induce or entice an individual to travel in interstate commerce to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(a); in Count Two, with knowingly and intentionally transporting individuals in interstate commerce with the intent that said individuals engage in illegal sexual activity; defendant Ventura has also been charged in Counts Four and Five with the same offense; in Count Three, defendant Ventura is charged with enticing an individual to travel in interstate commerce for purposes of engaging in illegal sexual activity; in Count Six, both defendants are charged with sex trafficking by force, fraud or coercion; and in Count Seven, defendant Ventura is charged with possessing or using a gun in relation to the sex trafficking offense.

Because of the overlapping instructions, the counts are discussed in groups of similar counts, not in order of their count. Always keep in mind however, that the jury must consider each count against each defendant separately, and that the burden is always upon the government to prove each count beyond a reasonable doubt.

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 53**

(Count Three – Entice Interstate Transportation for Prostitution
Third Element--Intent to Engage in Prostitution)

The third element which the government must prove beyond a reasonable doubt is that defendant acted with the intent that said individual would engage in prostitution or illegal sexual activity.

Direct proof of a person's intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time he committed an act with a particular intent. Such direct proof is not required. The ultimate fact of intent, though subjective, may be established by circumstantial evidence, based upon the defendant's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

As used in this instruction, the term "prostitution" means engaging in or agreeing or offering to engage in any lewd act with or for another person in exchange for money or other consideration.

As used in this instruction, the term "unlawful sexual activity" includes the following crimes:

Under Section 11-306 of the Maryland Criminal Code, it is a crime for a person while in Maryland to knowingly engage in prostitution by any means.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 64-9 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 54**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
The Indictment and the Statute)

Count Six of the Superseding Indictment charges the defendants with sex trafficking. The indictment reads as follows:

The Grand Jury for the District of Maryland further charges that:

From in or about September 2008 through in or about November 2010, in the District of Maryland and elsewhere, the defendants,

GERMAN DE JESUS VENTURA,
a/k/a/ "Chino,"
a/k/a "Chalo,"
a/k/a "Pancho,"
a/k/a "Chaco,"
KEVIN GARCIA FUERTES,
a/k/a "Kerlin Esau Esquivel-Fuentes,"
a/k/a "Flaco"

did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, and obtain by any means a person, namely, "R.D.F.," and did benefit, financially and by receiving anything of value, from participation in a venture engaged in such acts, knowing that force, fraud and coercion would be used to cause "R.D.F." to engage in a commercial sex act.

18 U.S.C. § 1591(a) (2008)
18 U.S.C. § 2

The indictment charges the defendant with violating section 1591 of Title 18 of the United States Code. That section provides

(a) Whoever knowingly-

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains or maintains by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act [just] described ..., knowing that means of force, threats of force, fraud, or coercion ... or any combination of such means will be used to cause the person to engage in a commercial sex act shall be [guilty of a crime].

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-17 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 55**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
Elements of the Offense)

In order to prove the defendant guilty of sex trafficking, the government must prove each of the following elements beyond a reasonable doubt:

First, that defendant knowingly recruited or enticed or harbored or transported or provided or obtained a person by any means;

Second, that defendant knew that force, fraud or coercion would be used with respect to this person;

Third, that defendant knew that this person would be engaged in a commercial sex act, as I will define that term for you;

Fourth, that defendant's conduct was in or affecting interstate or foreign commerce.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-18 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 56**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
First Element – Recruiting, Enticing, Transporting or Harboring)

The first element of the offense which the government must prove beyond a reasonable doubt is that defendant knowingly transported or recruited or enticed or harbored or provided or obtained "R.D.F." by any means.

To "harbor" someone means simply to provide shelter to that person.

An act is done knowingly when it is done purposely and intentionally, as opposed to mistakenly or inadvertently.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-18 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 57**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
Second Element – Use of Force, Fraud or Coercion)

The second element of the offense which the government must prove beyond a reasonable doubt is that defendant knew that force or fraud or coercion would be used with respect to "R.D.F."

The second element of sex trafficking requires the government to prove beyond a reasonable doubt that the defendant knew that force, fraud, or coercion would be used to cause "R.D.F." to engage in a commercial sex act.

The term "commercial sex act" means "any sex act, on account of which anything of value is given to or received by any person." The thing of value may be money or any other tangible or intangible thing of value that may be given to or received by any person, regardless of whether the person who receives it is the person performing the commercial sex act.

The term "force" means any form of power, violence, or physical pressure directed against another person.

The term "fraud" means any deliberate act of deception, trickery or misrepresentation.

Fraud, as I just used that term, means that the defendant knowingly made a misstatement or omission of a material fact to entice "R.D.F." A material fact is one which would reasonably be expected to be of concern to a reasonable person in relying upon the representation or statement in making a decision.

The term "coercion" means any threat of serious harm to or physical restraint against any person; or, any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or, any abuse or threatened abuse of law or the legal process. A threat is a serious statement expressing an intention to inflict harm, at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. A statement is a threat if it was made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to cause harm or a reasonable person making the statement would foresee that the recipient would understand it as a serious expression of intent to cause harm. The term "serious harm" includes both physical and non-physical types of harm, including psychological, financial, or reputational harm, that is sufficient under all of the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. In determining whether the defendant made a threat of serious harm that could reasonably be believed by "R.D.F.," you should consider "R.D.F.'s" particular station in life, physical and mental condition, age, education, training, experience and intelligence. A threat of serious harm must be sufficient in kind or degree to completely overcome the will of an ordinary person having the same general station in life as that of "R.D.F.," causing a reasonable belief that there was no reasonable choice except to engage in a commercial sex act as directed by the defendant.

"Threats of serious harm," which I just mentioned as one definition of coercion, includes threats of both physical and non-physical types of harm. They include threats of any

consequences, whether physical or non-physical, that are sufficient, under all the surrounding circumstances, to compel or coerce a reasonable person to perform commercial sex acts that she would not have otherwise been willing to perform.

"Abuse or threatened abuse of the law or legal process" is defined elsewhere in these instructions.

In considering whether force, fraud or coercion would be sufficient to cause a person to engage in commercial sex acts, you may consider not only the totality of the defendant's conduct under all of the surrounding circumstances, but also the alleged victim's special vulnerabilities, if any. By this I mean that you may consider any aspect of the alleged victim's age, background, station in life, physical or mental condition, experience or education, socioeconomic status, or any inequalities between the alleged victim and the defendant or any others working in concert with him. Simply put, you may ask whether an alleged victim was vulnerable in some way such that the use of force, fraud or coercion would have been enough to compel a reasonable person in the same circumstances to engage in commercial sex acts.

To prove sex trafficking, the government does not need to link each of the threats allegedly made or actions allegedly taken against an alleged victim to any particular commercial sex act performed by her. Rather, it is sufficient if the government has shown that the defendant's use of threats, force, fraud, deception, or coercion were sufficient to compel, or were sufficient to give rise to a climate of fear that would compel, a reasonable person in the alleged victim's situation to comply with the defendant's demands, in light of the totality of the defendant's conduct, the surrounding circumstances, and any vulnerabilities of the victim.

You may also consider whether the defendant's conduct gave rise to a climate of fear that

overcame the will of the alleged victim. A climate of fear that overcame the will of the victim may arise not only from a defendant's threats and other acts directed at the victim herself, but also from conduct directed at others of which the victim is aware.

The government need not prove physical restraint – such as the use of chains, barbed wire or locked doors – in order to establish the offense of sex trafficking. The fact that an alleged victim may have had an opportunity to escape is irrelevant if a defendant placed her in such fear or circumstances that she did not reasonably believe she could leave. A victim who has been placed in such fear or circumstances that she is afraid to leave is under no affirmative duty to try to escape.

If an alleged victim was threatened or made to suffer certain consequences in connection with her relationship to the defendant, either as punishment or to create a climate of fear that overcame her will and compelled her service, that may be sufficient to establish the "force, fraud, or coercion" element of this charge.

The fact that an alleged victim may have initially acquiesced to perform certain acts for a defendant does not preclude a finding that the victim was compelled to perform those acts thereafter. For example, if a victim willingly began to engage in commercial sex acts, then wanted to withdraw, but was forced to remain and perform commercial sex acts against her will by force, fraud, or coercion, or through threats of serious harm, or by a scheme, pattern or plan, intended to cause her to believe that her refusal would result in serious harm to her or another person, then you may find that her service became involuntary.

Whether a person is paid is not determinative of the question of whether that person has been compelled to engage in a commercial sex act. In other words, if a person is compelled to

engage in a commercial sex act through force, fraud, or coercion, such service is involuntary even if she is paid or compensated for the work.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-21 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 58**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
Third Element--Commercial Sex Act)

The third element which the government must prove beyond a reasonable doubt is that defendant knew that "R.D.F." would be engaged in a commercial sex act.

A "commercial sex act" is any sex act on account of which anything of value is given to or received by any person.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-22 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 59**

(Count Six – Sex Trafficking by Force, Fraud and Coercion
Fourth Element – Affecting Interstate Commerce)

The fourth element which the government must prove beyond a reasonable doubt is that defendant's conduct was in or affecting interstate or foreign commerce.

Interstate or foreign commerce simply means the movement of goods, services, money and individuals between any two or more states or between one state and the District of Columbia. Transporting a person across state lines for a commercial purpose is conduct "in interstate commerce." In addition, acts and transactions which are economic in nature and affect the flow of money in the stream of commerce to any degree, however minimal, also "affect" interstate commerce. For example, the use of hotels that service interstate travelers or the use of condoms that traveled in interstate commerce is conduct that "affects" interstate commerce.

To satisfy this element, the government must prove that the defendant's conduct affected interstate commerce in any way, no matter how minimal. You do not have to find that defendant's conduct actually affected interstate commerce if you find that the defendant's conduct would have affected interstate commerce if the defendant had successfully and fully completed his actions.

Finally, the government is not required to prove that the defendant knew he was affecting interstate commerce.

*United States v. Evans*, 476 F.3d 1176, 1179-80 (11th Cir. 2007)

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions* 47A-23 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 60**

(Count Seven – Possession of a Firearm in Furtherance of a Crime of Violence)

Count Seven charges that from in or about September 2008 through in or about November 2010, in the District of Maryland, defendant German Ventura did knowingly possess a firearm in furtherance of or use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, sex trafficking, in violation of 18 U.S.C. § 1591(a), as charged in Count Six. Count Seven of the Indictment reads as follows:

The Grand Jury for the District of Maryland further charges that:

1. The allegations set forth in Paragraphs 1, 2 and 4 through 20 of Count One are incorporated by reference here.

2. Beginning at least in or about March 2008 through in or about November 2010, in the District of Maryland, the defendant,

GERMAN DE JESUS VENTURA,
a/k/a "Chino,"
a/k/a "Chalo,"
a/k/a "Pancho,"
a/k/a "Chaco,"

did knowingly (1) possess a firearm in furtherance of, and (2) use and carry a firearm during and in relation to, a crime of violence for which he may be prosecuted in a court of the United States, that is, conspiracy to coerce and entice interstate travel for prostitution in violation of 18 U.S.C. § 371, as alleged in Count One, and sex trafficking in violation of 18 U.S.C. § 1591(a), as alleged in Count Six, of this Superseding Indictment, and in so doing, did brandish a firearm.

18 U.S.C. § 924(c)(1)(A)(ii)
18 U.S.C. § 2

The relevant statute on this subject is Title 18, United States Code section 924(c), which provides:

> . . . any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime [of violence], possesses a firearm, shall [be guilty of an offense against the United States].

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions*, 35-76 (modified).

## GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 61

(Count Seven – Possession of a Firearm in Furtherance of a Crime of Violence
Elements of the Offense)

In order to satisfy its burden of proof as to Count Seven, the government must establish each of the following elements beyond a reasonable doubt:

First: that the defendant committed a crime of violence as charged in the indictment, which is a crime for which he might be prosecuted in a court of the United States; and

Second: that the defendant knowingly possessed a firearm in furtherance of or used and carried the firearm in relation to, the charged crime of violence.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions*, 35-78.

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 62**

(Count Seven – Possession of a Firearm in Furtherance of a Crime of Violence
First Element - Commission of the Predicate Crime)

The first element the government must prove beyond a reasonable doubt is that the defendant committed a crime of violence for which he might be prosecuted in a court of the United States.

A crime of violence under this section includes the offense of sex trafficking. I have already instructed you that the offense of sex trafficking is a crime of violence.

If during your deliberations, you determine that the government has failed to prove beyond a reasonable doubt that the defendant is guilty as to the crime of violence (sex trafficking) as charged in Count Six, then you will proceed no further with Count Seven.

In reaching your verdict, you are to consider evidence of the crime of violence only for the purpose of determining whether this first element has been satisfied.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions*, 35-77 (modified); 35-79 (modified).

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 63**

(Count Seven – Possession of a Firearm in Furtherance of a Crime of Violence
Second Element - Possession of a Firearm in Furtherance of a Crime of Violence)

The second element the government must prove beyond a reasonable doubt is that the defendant knowingly possessed a firearm in furtherance of or knowingly used or carried a firearm during and in relation to, the commission of a crime of violence.

To prove that the defendant possessed the firearm in furtherance of the crime of violence, the government must prove that the defendant had possession of the firearm and that such possession was in furtherance of that crime. Possession also means that the defendant either had physical possession of the firearm on his person or that he had dominion and control over the place where the firearm was located and intention to exercise control over the firearm. To possess a firearm in furtherance of the crime means that the firearm helped forward , advance or promote the commission of this crime. The mere possession of the firearm at the scene of the crime is not sufficient under this definition. The firearm must have played some part in furthering the crime in order for this element to be satisfied.

For this element, you must also find that the defendant possessed the firearm knowingly. This means that he possessed the firearm purposely and voluntarily, and not by accident or mistake. It also means that he knew that the weapon was a firearm, as we commonly use the word. However, the government is not required to prove that the defendant knew that he was breaking the law.

A "firearm" is any weapon which will or is designed to or may be readily converted to expel a projectile by the action of an explosive.

In order to prove that the defendant used the firearm, the government must prove beyond a reasonable doubt an active employment of the firearm by the defendant during and in relation to the commission of the crime of violence. This does not mean that the defendant must actually fire or attempt to fire the weapon, although those would obviously constitute use of the weapon. Brandishing, displaying, or even referring to the weapon so that others present knew that the defendant had the firearm available if needed all constitute use of the firearm. However, the mere possession of a firearm at or near the site of the crime without active employment as I just described it is not sufficient to constitute a use of the firearm.

In order to prove that the defendant carried the firearm, the government must prove beyond a reasonable doubt that the defendant had the weapon within his control in such a way that it furthered the commission of the crime of violence or was an integral part of the commission of the crime. The defendant did not necessarily have to hold the firearm physically, that is, have actual possession of it on his person. If you find that the defendant had dominion and control over the place where the firearm was located, and had the power and intention to exercise control over the firearm in such a way that it furthered the commission of the crime of violence, you may find that the government has proven that the defendant carried the weapon. If applicable: It is not sufficient to prove carrying if all the government has proven is that the firearm was transported in a vehicle in which the defendant was riding. There must be proof that the defendant knew of the weapon's presence and had the power and intention to exercise control of the weapon so that it was available for his use in the commission of the crime if the need arose.

To satisfy this element, you must also find that the defendant carried or used the firearm

knowingly. This means that he carried the firearm purposely and voluntarily, and not by accident or mistake. It also means that he knew that the weapon was a firearm, as we commonly use the word. However, the government is not required to prove that the defendant knew that he was breaking the law.

In this case, you may find the defendant guilty of possessing a firearm if you find, beyond a reasonable doubt, either: (1) that the defendant was a member of a conspiracy, and the crimes of possessing a firearm was committed by others in furtherance of that conspiracy; or (2) that the defendant aided or abetted the possession of a firearm.

Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions*, 35-80; 18 U.S.C. § 924(c)(4) (modified)

MICHAEL D. MONTEMARANO, P.A.
*Attorney and Counsellor at Law*

10630 LITTLE PATUXENT PARKWAY
SUITE 146
COLUMBIA, MARYLAND 21044
(410) 992-0067
FAX (410) 992-6915
email: montemarano67@gmail.com

April 12, 2013

The Honorable William D. Quarles, Jr.
United States District Judge
United States Courthouse
101 West Lombard Street
Baltimore, MD 21201

Re: *United States v. German Ventura, et al.*
(Def: Kevin Fuertes)
No. WDQ-10-770
Defense response to proposed jury instructions

Dear Judge Quarles:

I write with Mr. Ruter to provide the Court with the defense response to the proposed jury instructions submitted by the government on April 1. We have only addressed those instructions with which we take issue, and offer no objection to those others not addressed in this letter, or to the use of unmodified pattern instructions from Sand, Siffert, et al.

**Proposed Instruction # 43 (p. 17)**

The defense objects to ¶ 8 ("Thus,") on p. 18, which is not a part of the pattern instruction, Sand, Siffert No. 19-6.

**Proposed Instruction # 46 (p. 23)**

At the very end of the instruction, on p. 25, the defense objects to the wording of the two elements set forth here, as incorrectly and impermissibly diminishing the government's burden. As reference to the pattern instruction makes clear, the jury should be obligated to find that a **particular individual named in the instruction** was "knowingly transported" in interstate commerce, and that the general reference to "an individual" must be replaced. We also object to the reference to "foreign" commerce, as no evidence of this has been adduced. We also note that this instruction is an amalgam of SS Nos. 64-1 and 64-2, and not solely from 64-2.

**Proposed Instruction # 48 (p. 27)**

This follows on the objection to # 46, and likewise is reflected in SS No. 64-4. In the second line of the instruction, the reference to "an individual" should be replaced with the reference to a **particular individual by name**, paralleling our previously described position.

**Proposed Instruction # 57 (p. 38)**

We object to ¶ 1, as surplusage to the form instruction which is fully addressed in ¶¶ 2-4, to which there is no objection. We object to ¶¶ 5-6, as there is no evidence of fraud that has been adduced; we would object to ¶ 5 in any event, as it is surplusage to that which is fully addressed in ¶ 6. In ¶ 7, we request that the words "prior conduct" be added after the word "experience" five lines from the bottom, and we also request that ¶ 7 end with the word "acts" in the next to last line. We object to the balance of the instruction, as we submit that it comprises two pages of language not in the pattern instruction, and unduly emphasizes the subjects addressed therein.

**Proposed Instruction # 59 (p. 44)**

We object to ¶ 2, except the first sentence. We submit that the balance of the paragraph comprises language not in the pattern instruction, and unduly emphasizes the subjects addressed therein.

**Proposed Instruction # 61 (p. 47)**

Ventura objects to the general rather than specific tenor of this instruction. As only a single crime of violence is charged, in Count 6, Ventura submits that the instruction should be addressed to "**the** crime of violence as charged in **Count 6**," as a more correct state of the charges, and more appropriately focusing the jury's attention.

Thank you again for your consideration in affording us additional time for this submission. We respectfully reserve the right to supplement and amend this in light of further developments during trial.

Very truly yours,

/s/

Michael D. Montemarano

MDM/ap

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA** :
:
**v.** :
: **CRIMINAL No. WDQ-10-0770**
**GERMAN DE JESUS VENTURA,** :
**and** :
**KEVIN GARCIA FUERTES** :
:
**Defendants.** :

**...ooOoo...**

## GOVERNMENT'S RESPONSE TO DEFENSE OBJECTIONS TO GOVERNMENT'S REQUESTED JURY INSTRUCTIONS

The United States of America, by and through its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, and P. Michael Cunningham and Rachel Miller Yasser, Assistant United States Attorneys for the District of Maryland, respectfully submits this response to Defendants' objections to the Government's Requested Instructions.

### GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 43

Defendant's object to the following paragraph:

> Thus, a defendant may be convicted of conspiracy without full knowledge of all of the conspiracy's details, if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on at least one occasion, even though he may not have participated before, might not participate again, and played only a minor role.

The United States contends this is an accurate summation of the Court's holding in *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996). The Court held that "[t]To satisfy that burden, the Government need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators. . . . Indeed, a defendant properly may be convicted of conspiracy

without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part. *Id.*

**GOVERNMENT'S REQUESTED JURY INSTRUCTIONS NO. 46 AND 48**

Defendants object to the following language in Requested Instruction 46:

> First, that the defendant(s) knowingly transported individuals in interstate or foreign commerce as alleged in the indictment; and
> Second, that defendant(s) transported said individuals with the intent that said individuals would engage in prostitution *or* illegal sexual activity.

Defendants object to the following similar language in Requested Instruction 48:

> The second element which the government must prove beyond a reasonable doubt is that defendant transported an individual with the intent that said individual would engage in prostitution *or* illegal sexual activity.

As to Counts Four and Five, the criminal conduct charged is specific to a particular date – August 2, 2010, and November 15, 2010, respectively. The Government does not have to name the individual(s) because that is not an element of the crime. As long as the jury is unanimous that the transportation occurred, and unanimous that someone was transported for the purpose of illegal sex on that trip, then it does not matter that they be unanimous as to who the person was.

The unit of offense is the transportation or the trip across state lines, and not the number of victims. *Bell v. United States*, 349 U.S. 81, 82 (1955). As long as the jury is unanimous about the trip and that the trip did, in fact, include someone, it does not matter if they do not agree on who the individual actually was.

As to Count Two, the criminal conduct covers a span of time during which transportation

on numerous dates of different individuals occurred. The Government agrees that the jury has to be unanimous as to a particular transportation, or trip, but not as to the identity of the individual transported and that the individual have been transported for the purpose of engaging in illegal sexual activity or prostitution. See, *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson v. United States*, 526 U.S. 813 (1999).

All the law requires is that the defendant(s) know that the individual is an actual person and that the purpose of the transportation of the person is for illegal sex. Adding an identity to the individual in the jury instructions seems to be adding an element not required by the statute.

The Government does not oppose deleting the reference to "foreign" commerce from the instructions.

**<u>GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 57</u>**

The Defendants object to the following paragraphs of this Instruction:

> Paragraph One: The second element of the offense which the government must prove beyond a reasonable doubt is that defendant knew that force or fraud or coercion would be used with respect to "R.D.F."
>
> Paragraph Five: The term "fraud" means any deliberate act of deception, trickery or misrepresentation.
>
> Paragraph Six: Fraud, as I just used that term, means that the defendant knowingly made a misstatement or omission of a material fact to entice "R.D.F." A material fact is one which would reasonably be expected to be of concern to a reasonable person in relying upon the representation or statement in making a decision.

The Government does not oppose deleting the first paragraph as it agrees that this is redundant with the second paragraph. However, as to the paragraphs relating to "fraud" the Government believes that the testimony of R.D.F. will indicate the appropriateness of providing definitions for all three predicates of force, fraud or coercion, any one of which alone can support

a finding of guilt.

Regarding the Defendants' request to add the words "prior conduct" after the word "experience" near the end of this paragraph, and that the paragraph end with the word "acts." The Defendants object to the balance of the this proposed instruction.

The Government contends that the requested changes to Paragraph Seven are not necessary and that the balance of this proposed instruction is necessary to properly instruct the jury as the requisite elements of the offense and submits the following authority in support of its requested instruction:

*Force, Fraud, or Coercion: United States v. Chacon*, 533 F.3d 250, 257 (4th Cir. 2008); ("[T]he use of force involves a degree of compulsion, it can be effected through 'power' or 'pressure' which do not necessarily have physical components." *citing United States v. Romero-Hernandez*, 505 F.3d 1082, 1088 (10th Cir. 2007)).

*Victim Vulnerability: United States v. Kozminski*, 487 U.S. 931, 952 (1988) (" "the vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve."); *United States v. Djoumessi*, 538 F.3d 547, 552-53 (6th Cir. 2008) (construing 18 U.S.C. § 1584) (discussing the victim's "special vulnerabilities," including her age, status as an illegal alien, lack of contact with anyone other than the defendant); *United States v. Alzanki*, 54 F.3d 994, 1002 (1st Cir. 1995) (affirming jury instruction directing consideration of whether victim *reasonably believed* that she had no choice except to remain in the service of the [defendants]" and holding that "[i]t was entirely proper to instruct the jury to consider [victim's] background and experience in assessing whether her fears were reasonable").

*Climate of Fear:* 22 U.S.C. § 7101(b)(5) (TVPA's legislative findings discussing conduct that isolates victims "from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable"); H.R. Conf. Rep. No. 106-939 at 100-01 (TVPA legislative history discussing schemes to place victims in fear of "harms such as banishment, starvation, or bankruptcy" as examples of means by which traffickers unlawfully intimidate victims); *Kozminski*, 487 U.S. at 956-57 (Brennan, J., concurring in judgment) (discussing range of coercive tactics that contributed to climate of fear in various involuntary servitude cases, including "disorienting the victims with frequent verbal abuse ... denying medical care and subjecting the victims to substandard food, clothing, and living conditions" requiring victims to work long hours with no days off, "leaving them tired and without free time to seek alternative work" "isolation from friends, family, transportation or other sources of food, shelter, clothing, or jobs; denying pay or creating debt that is greater than the worker's income; ... [and] controlling every detail of their lives"); *United States v. Farrell*, 563 F.3d 364, 378 (8th Cir. 2009) (holding that the trial testimony regarding the defendants' treatment of workers established that a "climate of fear" existed); *United States v. Alzanki*, 54 F.3d 994, 999 (1st Cir. 1995) (noting, in describing the facts, that "[t]he climate of fear was enhanced by [the victim's] witnessing one incident involving [her employer's] physical abuse of [his wife], and by learning from [the wife] that [the employer] struck [her] again shortly thereafter."); *United States v. King*, 840 F.2d 1276, 1281 (6th Cir. 1988) (force, threats, and other coercion created "pervasive climate of fear"); *United States v. Warren*, 772 F.2d 827, 833-34 (11th Cir. 1985) (finding "grotesque" the "use, or threatened use, of physical force to create a climate of fear"); *United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) (evidence that the

defendant beat people other than victim was relevant because it contributed to a "reign of physical terror"); *United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981) (assaults and threats created "climate of fear"); *United States v. Udeozor*, 515 F.3d 260, 266 (4th Cir. 2008)("it was not an abuse of discretion for the trial judge to allow the jury to hear evidence that sexual abuse was used to make the victim *believe* she had *no choice* but to comply with the Udeozors' demands.")(emphasis added).

*Opportunity to Escape*: The fact that [victims] may have had an opportunity to flee is not determinative of the question of forced labor if either or both of the defendants placed [victim] in such fear or circumstances that he did not reasonably believe he could leave."); *Alzanki*, 54 F.3d at 1000; *Warren*, 772 F.2d at 834 ("That the worker had the opportunity to escape is of no moment, if the defendant has placed him in such fear ... that he is afraid to leave"); *United States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir. 1977) ("a defendant is guilty of holding a person to involuntary servitude if the defendant has placed [the victim] in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape."); *Booker*, 655 F.2d at 567 (4th Cir. 1981) (holding that trial court "should not have charged the jury that it would have to find that the defendants' use of force effectively denied the possibility of escape to the victims. The availability of escape ... or even a situation where the discipline of terror is not constantly enforced, does not preclude a finding that persons are held as slaves."); *see also*, *Booker*, 655 F.2d at 566-67.

*Initial Agreement:* Pattern Crim. Jury Instr. 11th Cir., § 49 ("In considering whether service or labor was performed by someone involuntarily, it makes no difference that the person may have initially agreed, voluntarily, to render the service or perform the work. If a person

willingly begins work, but later desires to withdraw and is then forced to remain and perform work against that person's will by the use or threatened use of coercion, that person's service becomes involuntary."); *United States v. Mussry*, 726 F.2d 1448, 1454 n. 6 (9th Cir. 1984) ("Even though a person may come to a job voluntarily, subsequent coerced service constitutes involuntary servitude."), *overruled on other grounds*, *United States v. Kozminski*, 487 U.S. 931 (1988); *United States v. Bibbs*, 564 F.2d 1165 (5th Cir. 1977) (affirming conviction where victims initially agreed to work for defendants); *Harris*, 701 F.2d at 1100 ("even though a person may come to a job voluntarily, subsequent coerced service constitutes involuntary servitude).

*Payment: Alzanki*, 54 F.3d at 999 (noting that victims received some pay); Pattern Crim. Jury Instr. 11th Cir., § 49 ("Also, whether a person is paid a salary or a wage is not determinative of the question of whether that person has been held in involuntary servitude. In other words, if a person is forced to labor against that person's will by the use or threatened use of coercion, such service is involuntary even though the person is paid for the work.").

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 59**

Defendants object to the following language in paragraph two:

> Transporting a person across state lines for a commercial purpose is conduct "in interstate commerce." In addition, acts and transactions which are economic in nature and affect the flow of money in the stream of commerce to any degree, however minimal, also "affect" interstate commerce. For example, the use of hotels that service interstate travelers or the use of condoms that traveled in interstate commerce is conduct that "affects" interstate commerce.

The Government cited *United States v. Evans*, 476 F.3d 1176, 1179-80 (11th Cir. 2007) for authority on these examples of acts and transactions which affect interstate commerce. The law recognizes that there are things other than solely transportation of individuals that can support the interstate commerce element of this offense, and the jury should be so instructed.

The Government also notes that it inadvertently omitted inclusion of the disjunctive language in Requested Instructions 55 and 56 that the first element of the offense is that the "defendant knowingly recruited or enticed or harbored or transported or provided or obtained a person by any means, *or benefitted, financially or by receiving anything of value, from participation in the venture.* This language is part of the statute, was charged in Count Six, and should be included.

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 61**

The Defendants objected to the "general" tenor of this instruction. Although Defendants are correct that only a single crime of violence is charged in Count Six, this instruction was taken virtually verbatim from Sand, Siffert, *et al.*, *Modern Fed. Jury Instructions*, 35-78, and modification is not necessary.

**GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 51**

The Government requests the following additional language be included after the first paragraph of this instruction: "Induce" can be defined as to lead or move by influence or persuasion; to prevail upon, or alternatively, to stimulate the occurrence of; cause." *United States v. Daniels*, 685 F.3d 1237, 1245 -1246 (11th Cir. 2012).

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

/ss/

By: ______________________________
P. Michael Cunningham
Rachel M. Yasser
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | No. WDQ-10-770 |
| GERMAN DE JESUS VENTURA, et al. (Def: KEVIN GARCIA FUERTES) | * | |

* * * * * * * * * * * * *

**CONSOLIDATED JOINT DEFENSE POST-TRIAL MOTIONS**
**PURSUANT TO F.R.CR.P. 29 & 33**

Comes now the Defendant herein, Kevin Fuertes, through his undersigned counsel, Michael D. Montemarano, Esq., and Michael D. Montemarano, P.A., and on behalf of Defendnat German Ventura, through Gerald Ruter, Esq., hereby does move for a judgment of acquittal pursuant to pursuant to F.R.Cr.P. 29(c), and for a new trial pursuant to F.R.Cr.P. 33, and in support thereof does set forth the preliminary grounds for these Motions as follows:

The jury returned its verdicts on April 22, 2013. Defendant Fuertes was convicted on the following counts:

Count 1, conspiracy related to interstate prostitution, 18 USC § 371; and

Count 6, sex trafficking, 18 USC § 1591.

Fuertes was acquitted of Count 2, interstate transportation for purposes of prostitution, 18 USC § 2421.

Defendant Ventura was convicted on all counts, as follows:

Count 1, conspiracy related to interstate prostitution, 18 USC § 371;

Count 2, 4, and 5, interstate transportation for purposes of prostitution, 18 USC § 2421;

Count 3, coercion and enticement, 18 USC § 2422(a);

Count 6, sex trafficking for force, fraud and coercion, 18 USC § 1591; and

Count 7, use of a firearm with relation to a crime of violence (sex trafficking charged in Count 6), 18 USC § 924(c).

Defendants challenge their convictions on the grounds set forth herein, and upon other such grounds as will be submitted to the Court in the near future.

**I. The verdict was unsupported by adequate evidence to sustain a conviction beyond a reasonable doubt**

Defendants submit that the verdict on each Count against each Defendant was unsupported by adequate evidence to sustain the respective convictions to the standard of beyond a reasonable doubt.

**II. The verdicts were against the weight of the evidence**

Defendants submit that the verdict on each Count was against the weight of the evidence adduced on said Count.

**III. Reassertion of grounds previously placed in the record**

Defendant hereby reasserts each and every ground previously set forth in all defense pre-trial motions, motions *in limine*, motions during trial and trial objections, as if fully set forth herein.

**IV. Notice of further filings**

Defendants each will file a more fully realized version of his respective post-trial motions, along with a memorandum of law discussing and expanding upon these issues more fully, insofar as applicable, along with a sentencing memorandum, which will be filed on or before June

24, 2013.

**V. Stipulation of Oppostion**

The defense notes for the record, pursuant to discussions with government counsel, that the government opposes the grant of the requested relief. In the view of the parties the government need not file a response to the instant filing, and need only file in response to the final defense filing, if this is acceptable to the Court.

Respectfully submitted,

May 1, 2013

/s/
MICHAEL D. MONTEMARANO

Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, Maryland 21044
(410) 992-0067/Fax 992-6915
Counsel of Record/CJA Counsel
For Defendant Fuertes

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on or before this 1st day of May, 2013, a copy of the foregoing *Consolidated Post-Trial Motions, etc.*, was filed via ECF, and served thereby on Michael Cunnningham and Rachel Yasser, Esqs., Assistant United States Attorneys, 36 South Charles Street, Suite 400, Baltimore, MD 21202.

MICHAEL D. MONTEMARANO